**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 14-1299**
_____

YASMIN REYAZUDDIN,

                    Plaintiff – Appellant,

          v.

MONTGOMERY COUNTY, MARYLAND,

                    Defendant – Appellee.

-----------------------------------

AMERICAN COUNCIL OF THE BLIND; AMERICAN CIVIL LIBERTIES
UNION; ASSOCIATION ON HIGHER EDUCATION AND DISABILITY;
CIVIL RIGHTS EDUCATION AND ENFORCEMENT CENTER; DISABILITY
RIGHTS ADVOCATES; LEGAL AID SOCIETY – EMPLOYMENT LAW
CENTER; MARYLAND EMPLOYMENT LAWYERS ASSOCIATION; NATIONAL
ASSOCIATION OF THE DEAF; NATIONAL DISABILITY RIGHTS
NETWORK; PUBLIC JUSTICE CENTER, INC.,

                    Amici Supporting Appellant.

_____

Appeal from the United States District Court for the District of
Maryland, at Greenbelt.   Deborah K. Chasanow, Chief District
Judge.  (8:11-cv-00951-DKC)

_____

Argued:  January 28, 2015            Decided:  June 15, 2015

_____

Before TRAXLER, Chief Judge, and DIAZ and THACKER, Circuit
Judges.

_____

Affirmed in part, reversed in part, and remanded by published opinion. Judge Diaz wrote the opinion, in which Chief Judge Traxler and Judge Thacker joined.

———————————

**ARGUED:** Daniel Frank Goldstein, BROWN, GOLDSTEIN & LEVY, LLP, Baltimore, Maryland, for Appellant. Karen Louise Federman Henry, COUNTY ATTORNEY'S OFFICE FOR THE COUNTY OF MONTGOMERY, Rockville, Maryland, for Appellee. **ON BRIEF:** Joseph B. Espo, Matthias L. Niska, BROWN, GOLDSTEIN & LEVY, LLP, Baltimore, Maryland, for Appellant. Marc P. Hansen, County Attorney, Patricia P. Via, Chief, Division of Litigation, Patricia Lisehora Kane, Associate County Attorney, COUNTY ATTORNEY'S OFFICE FOR THE COUNTY OF MONTGOMERY, Rockville, Maryland, for Appellee. Susan Mizner, Claudia Center, AMERICAN CIVIL LIBERTIES UNION FOUNDATION, San Francisco, California; Amy Robertson, CIVIL RIGHTS EDUCATION AND ENFORCEMENT CENTER, Denver, Colorado, for Amici Curiae.

———————————

DIAZ, Circuit Judge:

Montgomery County, Maryland, opened a new, consolidated call center using software that was inaccessible to blind employees. The County did not transfer employee Yasmin Reyazuddin, who is blind, to the call center along with her sighted coworkers. The County also did not hire her for a vacant position there. Reyazuddin challenged the County's actions as violating Section 504 of the Rehabilitation Act of 1973, 29 U.S.C.A. § 794 (West 2014), or Title II of the Americans with Disabilities Act of 1990 (the "ADA"), 42 U.S.C. § 12131 et seq. (2012).

Section 504 forbids an employer from discriminating against an employee because of her disability. It also requires an employer to accommodate an employee with a disability who can perform the essential functions of a job with a reasonable accommodation. But an employer avoids liability if it can show that providing an accommodation would constitute an "undue hardship."

We find that genuine issues of material fact remain as to (1) whether Reyazuddin could perform the essential job functions of a call center employee; (2) whether the County reasonably accommodated her; and (3) if the County did not, whether its failure to do so may be excused because of undue hardship. Accordingly, we reverse the district court's order granting

3

summary judgment to the County on Reyazuddin's Section 504 claims. However, we affirm the district court's order granting summary judgment to the County on Reyazuddin's Title II claim because public employees cannot use Title II to bring employment discrimination claims against their employers.

I.

A.

In early 2008, as part of its $80 million Technology Modernization Project, Montgomery County decided to consolidate its 1,500 telephone numbers for 38 offices and departments into one call center that residents could reach by dialing 311. The County's goals for its consolidated call center (dubbed MC311) were to achieve accountability, responsiveness, and efficiency.

In January 2009, the County decided to outfit MC311 with software called Siebel Public Sector 8.1.1, licensed from Oracle. This software met the County's goals, was compatible with other Oracle software already used by the County, and was cost-effective as a "commercial-off-the-shelf," as opposed to custom, product.

The Siebel software can be operated in two modes: high-interactivity or standard-interactivity. High-interactivity

4

mode is not accessible[1] because it is written in Microsoft ActiveX, a technology that screen reader software cannot interpret. Screen reader software enables users who are blind to operate a computer through keyboard shortcuts, instead of mouse clicks, and by hearing synthesized speech or using a refreshable Braille display, in place of reading the screen. Standard-interactivity mode, however, is accessible because it is written in standard HTML and Javascript, which are compatible with screen reader software.

The County's license allows it to run the software in either mode. Moreover, it is technologically feasible for some employees to operate the software in high-interactivity mode while others work in standard-interactivity mode. Doing so does not impact overall employee productivity.

The County nonetheless chose to configure the software at MC311 in high-interactivity mode for all employees.[2] In this mode, employees use three features--the CTI Toolbar,

---

[1] By "accessible" here and in other variations throughout the opinion, we mean "accessible to blind employees."

[2] The County expects employees operating in high-interactivity mode to handle fifty-five to seventy calls per day with an average call time of three minutes plus ninety seconds to finish their after-call work. Although we do not know how (or if) operating a call center in standard-interactivity mode affects productivity, the record shows that four other U.S. call centers are accessible by operating in both modes, operating in standard-interactivity mode only, or using a custom solution.

5

SmartScript, and Email Response--that are not available in standard-interactivity mode.

The CTI Toolbar integrates MC311's phone system and the Siebel software. Employees use the CTI Toolbar to make themselves available to take calls and to answer and transfer calls. SmartScript generates a pop-up window containing a script for employees to read to callers, a field for typing notes about the call, and a function to transfer emergency calls to 911. Employees then close SmartScript and the service request template pops up with fields automatically filled in with the information previously typed into SmartScript.

The service request form has a keyword search function that generates a list of articles to help employees answer the caller's question. Once employees have identified the best article, they click on the "attach solution" button to add it to the service request form. This in turn causes several fields in the form to populate automatically. These fields include the appropriate department; the County's "public answer," which is a "short, concise paragraph about how the [C]ounty handles" the caller's particular concern; and instructions for employees on how to handle the call. J.A. 487–88.[3]

---

[3] Email Response "is a program that allows [employees] to send emails to customers in response to a telephone call." (Continued)

The County first asked Oracle about MC311's accessibility in November 2009, more than eleven months after purchasing the license. Oracle told the County that the CTI Toolbar, SmartScript, and Email Response features of the Siebel software would not be accessible until mid-2010. Oracle also estimated that it would cost $200,000 to make the Siebel software accessible through standard-interactivity mode, without those three features.

Over the next sixteen months, the County received increasing estimates about the cost of accessibility from Opus Group, a subcontractor hired to configure and implement the Siebel software at MC311. The first estimate to make standard-interactivity mode available at MC311 was $222,075. A second option to give "back office" employees access to assigned service requests would cost $65,625. By April 2011, these estimates rose to $399,270 and $240,867, respectively. All the while, the CTI Toolbar, SmartScript, and Email Response features remained inaccessible.

---

Reyazuddin v. Montgomery Cnty., Md., 7 F. Supp. 3d 526, 533 (D. Md. 2014).

B.

Since 2002, Yasmin Reyazuddin has worked in the County's Department of Health and Human Services, most recently as one of five Information and Referral Aides. In that role, she answered questions from County residents who called about the Department's services, referrals to County programs, and the status of applications for benefits. Reyazuddin, who is blind, performed her job using screen reader software. Reyazuddin also used a Braille embosser, which allowed her to print in Braille.

Reyazuddin first learned about the County's plans to create MC311 in May 2008 from her then-supervisor. Over the next sixteen months, Reyazuddin and the other Information and Referral Aides received updates on MC311's general progress. During this time, the County was determining how to staff MC311's forty-nine positions.

In October 2009, JoAnne Calderone, Manager for Planning, Accountability, and Customer Service in the Department of Health and Human Services, met with the five Information and Referral Aides and formally told them that their unit was transferring to MC311. The County planned to transfer Reyazuddin and one other aide on November 9, with the three remaining aides to follow two weeks later. The other four Information and Referral Aides are not blind.

Reyazuddin expressed concern about MC311's accessibility. She also told Calderone that she had scheduled leave from October 28 to November 28, 2009, for a trip to India. Calderone emailed this information to Leslie Hamm, then-Manager and now-Director of MC311, who responded that the County's Disability Program Manager, Ricky Wright, suggested that "the date of [Reyazuddin's] detail to MC311 be delayed indefinitely or at least until . . . she returns from pre-approved leave." J.A. 1046.

One aide transferred as scheduled on November 9. By the time Reyazuddin returned from her trip, the other three aides had also transferred to MC311. But Reyazuddin was not transferred and instead was told to return to her pre-vacation job site at the main administrative building for the Department of Health and Human Services. She continued to perform her duties by answering the Department information line until February 4, 2010, when the information line was switched off and calls were transferred to MC311. For one day, Reyazuddin had nothing to do. Then the County decided that MC311 would not handle Manna Food Center referrals, which allow eligible low-income individuals to receive food from a private, non-profit food bank. Reyazuddin was assigned this task, but it was not full-time work.

9

In March 2010, Reyazuddin was assigned to work in the Department's Aging and Disability Unit for Adult Services Intake.[4] For the next six months, Reyazuddin's supervisors struggled to find work for her. They thought her work situation was temporary until she could be transferred to MC311. However, on October 1, 2010, Wright informed Reyazuddin that she would not be transferring to MC311 because it would be too expensive for the County to make the software accessible. Wright "recommend[ed] the reasonable accommodation of 'reassignment to a vacant position' (priority consideration) in accordance with" the County employees' collective bargaining agreement. J.A. 1045.

From 2010 to 2012, Reyazuddin had the same salary, grade, and benefits as she did before MC311's launch. But although her supervisors pieced together tasks for her to perform, she did not have full-time work.

In 2012, Reyazuddin and eight other applicants were interviewed for one of two vacancies at MC311. Reyazuddin was not one of the two top-scoring applicants who the interviewers recommended to fill the vacancies. Although not required to do

---

[4] This assignment came after the County had given her a choice between working with the Children's Resource Center or the Aging and Disability Resource Unit.

10

so under County policy, Hamm ultimately hired the recommended applicants.

## C.

Reyazuddin alleges that, in 2009, the County violated Section 504 of the Rehabilitation Act by (1) failing to accommodate her disability by making MC311's software accessible and (2) discriminating against her when it did not transfer her to MC311 along with her coworkers. Reyazuddin also alleges that, in 2012, the County violated Title II of the ADA by not hiring her to fill an MC311 vacancy.[5]

Reyazuddin retained an expert, Temeko Richardson, to evaluate the cost of making MC311 accessible by developing a custom "widget" as a workaround for the CTI Toolbar. The custom solution would be compatible with screen reader software. Richardson had previously seen this alternative at work in other call centers. Her lowest cost estimate was $129,600.

The County had an expert, Brad Ulrich, review Richardson's report. Ulrich noted flaws in the report and estimated that the actual cost to implement the least expensive accessibility option suggested by Richardson would be $648,000.

---

[5] The district court granted Reyazuddin's motion for leave to file a supplemental complaint in July 2012 to add allegations about the County's 2012 conduct, but the court previously denied her motion for leave to amend her complaint to add a claim that the County's 2009 conduct violated Title II.

11

To give these cost estimates some context, the County's total budget for fiscal year 2010 was $3.73 billion. MC311's budget for fiscal year 2011 was about $4 million. By late January 2011, the County had spent about $11.4 million on MC311. But the County estimates that MC311 has saved it $10.3 million in fiscal years 2010 and 2011.

Following a period of discovery, both parties moved for summary judgment. The district court granted the County's motion and denied Reyazuddin's. Regarding the failure-to-accommodate claim, the court found that a genuine issue existed "as to whether [Reyazuddin's] proposed accommodation permits her to perform the essential functions of the [MC311] job." Reyazuddin, 7 F. Supp. 3d at 548. But the court determined that the County reasonably accommodated Reyazuddin by providing her with comparable employment. Id. at 551. The court also concluded that no genuine issue existed on the County's undue hardship defense and that the County prevailed on that defense as a matter of law. Id. at 549.

On Reyazuddin's disparate-treatment claim based on the County not transferring her to MC311, the district court determined that the claim rose and fell with the failure-to-accommodate claim; because the County had shown as a matter of law that accommodating Reyazuddin at MC311 was an undue hardship, its decision to not transfer her lacked discriminatory

12

intent.  Id. at 554-55.  Finally, as to Reyazuddin's Title II claim, the court concluded that Reyazuddin failed to present sufficient evidence that the County's decision not to hire her for a vacant MC311 position was pretext for discrimination.  Id. at 557-58.

Reyazuddin appealed.

II.

We review de novo a district court's summary judgment order.  D.L. ex rel. K.L. v. Balt. Bd. of Sch. Comm'rs, 706 F.3d 256, 258 (4th Cir. 2013).  "Summary judgment is appropriate only where there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law."  Id.  The pertinent inquiry is whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).  The evidence must be viewed in the light most favorable to the non-moving party, with all reasonable inferences drawn in that party's favor.  D.L., 706 F.3d at 258.  "The court therefore cannot weigh the evidence or make credibility determinations."  Jacobs v. N.C. Admin. Office of the Courts, 780 F.3d 562, 569 (4th Cir. 2015).

13

Section 504 of the Rehabilitation Act mandates that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  29 U.S.C.A. § 794(a).  Relevant to this appeal, Section 504 defines "program or activity" as "all of the operations of . . . a department . . . of a State or of a local government."[6]  Id. § 794(b)(1)(A).

Employment discrimination claims brought under Section 504 are evaluated using the same standards as those "applied under [T]itle I of the Americans with Disabilities Act of 1990."  Id. § 794(d).  Of significance here, Title I prohibits employers from "discriminat[ing] against a qualified individual on the basis of disability" by "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless [a] covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity."  42 U.S.C. § 12112(b)(5)(A) (2012).  A "qualified individual" is "an

---

[6] The County on appeal has abandoned its defense to Section 504 liability based on MC311 not receiving federal funding.

14

individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." Id. § 12111(8).

We consider in turn Reyazuddin's Section 504 failure-to-accommodate and disparate-treatment claims.

## A.

To establish a prima facie case on her failure-to-accommodate claim, Reyazuddin must show that (1) she qualifies as an "individual with a disability" as defined in 29 U.S.C.A. § 705(20); (2) the County had notice of her disability; (3) she could perform the essential functions of her job with a reasonable accommodation; and (4) the County refused to make any reasonable accommodation. 29 U.S.C.A. § 794(a); Wilson v. Dollar Gen. Corp., 717 F.3d 337, 345 (4th Cir. 2013).

Even if Reyazuddin establishes her prima facie case, the County avoids liability if it can show as a matter of law that the proposed accommodation "will cause 'undue hardship in the particular circumstances.'" Halpern v. Wake Forest Univ. Health Scis., 669 F.3d 454, 464 (4th Cir. 2012) (quoting U.S. Airways v. Barnett, 535 U.S. 391, 401-02 (2002)). Courts have reconciled and kept distinct the "reasonable accommodation" and "undue hardship" requirements by holding that, at the summary judgment stage, the employee "need only show that an 'accommodation' seems reasonable on its face," and then the

15

employer "must show special (typically case-specific) circumstances that demonstrate undue hardship." Barnett, 535 U.S. at 401-02.

That Reyazuddin satisfied the first two elements is undisputed, but the parties disagree on the third and fourth elements and the County's undue hardship defense.

1.

On the third element, the parties dispute whether Reyazuddin's proposed accommodations are reasonable and what constitutes the essential job functions of an MC311 employee. Title I provides that a "reasonable accommodation" includes

>     (A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and
>
>     (B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

42 U.S.C. § 12111(9).

To overcome a motion for summary judgment, Reyazuddin was required to "present evidence from which a jury may infer that the [proposed] accommodation is 'reasonable on its face, i.e., ordinarily or in the run of cases.'" Halpern, 669 F.3d at 464

16

(quoting Barnett, 535 U.S. at 401). A reasonable accommodation is one that is feasible or plausible. Barnett, 535 U.S. at 402.

To determine essential job functions, Title I requires that consideration "be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job." 42 U.S.C. § 12111(8).

We agree with the district court that a genuine issue of material fact exists on this element. Reyazuddin has suggested two accommodations that she says will allow her to perform the essential job functions of an MC311 employee: the County could (1) configure its Siebel software to run concurrently in the accessible standard-interactivity mode or (2) create a custom workaround "widget" for the CTI Toolbar.

Reyazuddin supported the reasonableness of these proposals through evidence from her expert, Temeko Richardson. Richardson worked with two call centers in California and Pennsylvania that were accessible by operating simultaneously in high-interactivity and standard-interactivity modes. She also worked with a third call center in Illinois where all employees, including one blind employee, operated in standard-interactivity

17

mode. And a fourth call center client in Pennsylvania was accessible through a custom solution.

The County counters that its decision to configure the Siebel software in the inaccessible high-interactivity mode, with the CTI Toolbar in particular, "maximize[s call center employees'] efficiency and productivity . . . while keeping the cost of delivering government services as low as possible." Appellee's Br. at 17. The record, however, is silent about the productivity of employees operating in standard-interactivity mode, and so the County is left to speculate that employees operating without the bells and whistles of the high-interactivity mode configuration must be less productive. Even if we were willing to credit that assumption, it does not necessarily follow that using the high-interactivity software configuration is an essential job function, particularly in light of Reyazuddin's evidence of other call centers functioning without it.

The County also argues that Reyazuddin's proposed accommodations would not allow her to perform the essential job function of reading maps and PDF documents, which are used to respond to MC311's most frequent call about the estimated arrival time for the next public bus. However, this contention is contrary to the deposition testimony of the County's Disability Program Manager, Ricky Wright, that Reyazuddin

18

"certainly has the knowledge, skills and abilities" to perform the essential functions of the MC311 job. J.A. 317. Moreover, when Reyazuddin applied for a vacancy at MC311 in 2012, she was interviewed after the Office of Human Resources determined that she met the minimum qualifications. In light of this evidence, we think that a genuine issue remains as to whether Reyazuddin could perform the essential job functions with a reasonable accommodation.

2.

Turning to the fourth element of the failure-to-accommodate claim, Reyazuddin argues that the district court erred by finding as a matter of law that the County provided a reasonable accommodation by reassigning her to "comparable employment." Reyazuddin, 7 F. Supp. 3d at 551. We agree that the district court improperly engaged in fact finding instead of viewing the evidence in the light most favorable to Reyazuddin.

An employer may reasonably accommodate an employee without providing the exact accommodation that the employee requested. Rather, the employer may provide an alternative reasonable accommodation. See Hankins v. The Gap, Inc., 84 F.3d 797, 800 (6th Cir. 1996) ("[T]he employer providing the accommodation has the ultimate discretion to choose between effective accommodations, and may choose the less expensive accommodation or the accommodation that is easier for it to provide.")

19

(quoting EEOC Interpretive Guidance on Title I of the Americans with Disabilities Act, 29 C.F.R. pt. 1630 app. at 406 (2014)). Title I provides "job restructuring" and "reassignment to a vacant position" as examples of reasonable accommodations. 42 U.S.C. § 12111(9). Nonetheless, "a reasonable accommodation should provide a meaningful equal employment opportunity. Meaningful equal employment opportunity means an opportunity to attain the same level of performance as is available to nondisabled employees having similar skills and abilities." H.R. Rep. No. 101-485, pt. 2, at 66 (1990), reprinted in 1990 U.S.C.C.A.N. 303, 349.

Here, although Reyazuddin maintained her salary, pay grade, and benefits, the County cobbled together an assortment of "make-work" tasks that did not amount to full-time employment. For example, an email from a County employee shortly before Reyazuddin was assigned to work in the Aging and Disability Unit expressed concern that her job responsibilities would be "make work" as opposed to "real, meaningful work." J.A. 1041. In a later email, JoAnne Calderone, Manager for Planning, Accountability, and Customer Service in the Department of Health and Human Services, suggested a meeting to discuss how to provide Reyazuddin "with a full day of meaningful work." J.A. 1024. And a separate series of emails demonstrates a tug-of-war between Calderone and MC311 over Manna referrals, Reyazuddin's

20

primary responsibility, with the work being transferred from MC311 to Reyazuddin, back to MC311, and then back to Reyazuddin despite a County employee's opinion that residents "would be served better" by having these referrals handled within MC311. J.A. 294-95; Plaintiff's Cross-Motion for Partial Summary Judgment at Exhibit 65, Reyazuddin, No. 8:11-cv-951.

Moreover, in her supplemental affidavit, Reyazuddin stated that Manna referrals--her only "regular task[]"--had decreased and "could be done in about one hour per day." J.A. 1015. She also estimated that it "takes a maximum of four to five hours per day . . . to complete all of [her] work." Id.

We hold that the record evidence creates a genuine issue of material fact as to whether the accommodation provided by the County was reasonable. See Pandazides v. Va. Bd. of Educ., 13 F.3d 823, 833 (4th Cir. 1994) (noting that "reasonable accommodation" is a question of fact).

3.

As an alternative to finding that Reyazuddin did not establish a prima facie case, the district court held that the County prevailed on its undue hardship defense as a matter of law. We cannot agree.

An employer is not liable under Section 504 if it "can demonstrate that the accommodation would impose an undue hardship on the operation of [its] business." 42 U.S.C.

21

§ 12112(b)(5)(A). Title I defines "undue hardship" as "an action requiring significant difficulty or expense, when considered in light of the factors set forth in subparagraph (B)." Id. § 12111(10)(A). Subparagraph (B), in turn, provides a non-exhaustive list of relevant factors:

> (i) the nature and cost of the accommodation needed under this chapter;
>
> (ii) the overall financial resources of the facility or facilities involved in the provision of the reasonable accommodation; the number of persons employed at such facility; the effect on expenses and resources, or the impact otherwise of such accommodation upon the operation of the facility;
>
> (iii) the overall financial resources of the covered entity; the overall size of the business of a covered entity with respect to the number of its employees; the number, type, and location of its facilities; and
>
> (iv) the type of operation or operations of the covered entity, including the composition, structure, and functions of the workforce of such entity; the geographic separateness, administrative, or fiscal relationship of the facility or facilities in question to the covered entity.

Id. § 12111(10)(B).

The district court gave two reasons for its conclusion that the County was entitled to summary judgment on its undue hardship defense. First, the court criticized the estimated cost of $129,000 proffered by Reyazuddin's expert as "unsupported" because "it [did] not take into account increased costs for maintenance and upkeep." Reyazuddin, 7 F. Supp. 3d at 549. Second, the court explained that, as a result of

22

Reyazuddin's proposed accommodation, the employee-facing portion of MC311 "would be altered and would result in increased maintenance and more downtime, which could spill over into the customer service realm." Id. We believe that the district court's analysis improperly weighed conflicting evidence, did not view the evidence in the light most favorable to Reyazuddin, and overemphasized one factor while overlooking the others.

"At the summary judgment stage the judge's function is not [her]self to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249. By concluding that the lowest estimate of cost was "unsupported," the district court credited the County's expert, Brad Ulrich, and discredited Reyazuddin's expert, Temeko Richardson. At this point, however, it is undisputed that both Ulrich and Richardson qualify as experts. The evidence therefore sets up a battle of the experts, which should not be resolved at summary judgment.

In addition, the district court focused almost exclusively on the cost of the accommodations, without regard to the other statutory factors. For instance, the district court's analysis does not mention the number of employees at MC311 (forty-nine) or the considerable savings the County realized from creating a centralized call center ($10 million).

The district court also did not acknowledge the County's substantial personnel resources at MC311 during the configuration and implementation of the Siebel software. At the project's peak, four Opus Group consultants were working for the County on MC311; one consultant who worked 40 hours per week for the County and spent 80% of his time doing maintenance of the call center application testified that he was "not too busy"; the County paid Opus Group $5,000 per week; and the County had a Senior IT Specialist on staff who was certified as a Siebel consultant. J.A. 583, 588-89, 594, 782. Thus, the evidence is in dispute about the additional resources the County would have needed to configure, implement, and maintain the Siebel software in standard-interactivity mode or adopt another accessibility solution.

Aside from cost, the district court credited the County's arguments that the proposed accommodations could negatively affect the overall operation of MC311, result in increased system maintenance and downtime, and potentially "spill over" to impact the overall customer service experience. Reyazuddin, 7 F. Supp. 3d at 549. This analysis misapplies the summary judgment standard. The evidence should be viewed in the light most favorable to Reyazuddin as the non-moving party, not the County. Reyazuddin presented evidence of other call centers operating simultaneously in high-interactivity and standard-

24

interactivity mode as well as her expert's opinion that the proposed solutions for accessibility would "allow a blind user to work at MC311 without altering the experience of sighted users." J.A. 909. Moreover, speculation about spillover effects cannot aid the County in establishing its undue hardship defense as a matter of law.

The district court also relied on an irrelevant factor in assessing undue hardship--the County's budget for reasonable accommodations. Specifically, the court noted the County's "meager budget for reasonable accommodations: the first $500 is paid for by the employee's department. Whatever costs remain can be paid from a $15,000 line-item in the County's overall budget." Reyazuddin, 7 F. Supp. 3d at 549.

Allowing the County to prevail on its undue hardship defense based on its own budgeting decisions would effectively cede the legal determination on this issue to the employer that allegedly failed to accommodate an employee with a disability. Taken to its logical extreme, the employer could budget $0 for reasonable accommodations and thereby always avoid liability. The County's overall budget ($3.73 billion in fiscal year 2010) and MC311's operating budget (about $4 million) are relevant factors. See 42 U.S.C. § 12111(10)(B)(ii)-(iii). But the County's line-item budget for reasonable accommodations is not.

25

In effect, the district court reduced a multi-factor analysis to a single factor--cost--that the court believed was simply too much for the County to bear. But while cost is important, it cannot be viewed in isolation. Rather, it is the relative cost, along with other factors, that matters. In that regard, we think it particularly relevant that other call centers have been able to accommodate blind employees. See Am. Council of the Blind v. Paulson, 525 F.3d 1256, 1272 (D.C. Cir. 2008) (affirming the entry of a declaratory judgment on Section 504 liability in part by finding that "because other currency systems accommodate the needs of the visually impaired, the Secretary[ of the Treasury]'s burden in demonstrating that implementing an accommodation [to make U.S. paper currency accessible to blind individuals] would be unduly burdensome is particularly heavy").

Because we find a genuine issue for trial on the third and fourth elements of Reyazuddin's prima facie case and the County's defense, we reverse the district court's order granting summary judgment to the County on Reyazuddin's failure-to-accommodate claim.

B.

Reyazuddin's disparate-treatment claim, related to the County's decision to not transfer her to MC311 in 2009 along with her sighted colleagues, overlaps considerably with her

26

failure-to-accommodate claim.  To establish a prima facie case of disparate treatment, Reyazuddin must show that she (1) has a disability; (2) is otherwise qualified for the employment; and (3) was excluded from that employment due to discrimination solely on the basis of her disability.  Doe v. Univ. of Md. Med. Sys. Corp., 50 F.3d 1261, 1264-65 (4th Cir. 1995).  As with the failure-to-accommodate claim, the first element here is undisputed.

The "otherwise qualified" element is the same as the third element of the failure-to-accommodate claim because a "qualified individual" is someone "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  42 U.S.C. § 12111(8).  Thus, our earlier holding--that there is a genuine issue of material fact as to whether Reyazuddin is able to perform the essential job functions with a reasonable accommodation--applies here as well.

The third element contains two subparts: (1) an adverse employment action and (2) discrimination based solely on disability.  The district court assumed without deciding that Reyazuddin suffered an adverse employment action, but the County argues on appeal that Reyazuddin did not because she continues to be a Department of Health and Human Services employee with the same salary, grade, and benefits as she had before MC311

27

opened. But, as discussed above, we think that a genuine issue of material fact remains due to Reyazuddin's evidence that her new responsibilites involve make-work tasks that do not amount to full-time work.

Turning to the discrimination subpart, the district court properly applied the burden-shifting framework from McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

> Under the McDonnell Douglas proof scheme, the plaintiff has the initial burden of proving a prima facie case of discrimination by a preponderance of the evidence. If the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory explanation which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the [adverse] employment action. If the defendant meets this burden of production, the presumption created by the prima facie case "drops out of the picture," and the plaintiff bears the ultimate burden of proving that she has been the victim of intentional discrimination.

Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc., 53 F.3d 55, 58 (4th Cir. 1995) (applying this framework to a Title I discrimination claim). The district court assumed without deciding that Reyazuddin met her initial burden. Because the County does not dispute this on appeal, we proceed on the same assumption.

Regarding the County's burden, the district court concluded that because the County had proved its undue hardship defense as a matter of law, it had offered an irrefutably nondiscriminatory

28

reason for not transferring Reyazuddin. Reyazuddin, 7 F. Supp. 3d at 554-55. Other than undue hardship, the County has not offered any other nondiscriminatory reason for not transferring Reyazuddin. Because we hold that a genuine issue for trial remains on the County's undue hardship defense, that same issue precludes summary judgment for the County under the McDonnell Douglas framework. We therefore reverse the district court's grant of summary judgment to the County on Reyazuddin's disparate-treatment claim.

## III.

Reyazuddin's final claim is that the County violated Title II of the ADA by not hiring her to fill a vacancy at MC311. Title II prohibits discrimination against "qualified individual[s] with a disability" in the delivery of "services, programs, or activities of a public entity." 42 U.S.C. § 12132. The district court assumed without deciding that Title II applies to public employment discrimination claims based on two of our previous cases that similarly assumed without analysis that Title II could be used in this context. Reyazuddin, 7 F. Supp. 3d at 556 (citing Rogers v. Dep't of Health & Envtl. Control, 174 F.3d 431, 432-33 (4th Cir. 1999), and Doe, 50 F.3d at 1264-65).

29

Our sister circuits have divided on this issue.  See Bd. of Trustees of the Univ. of Ala. v. Garrett, 531 U.S. 356, 360 n.1 (2001) (acknowledging but not resolving the split).  The Second, Seventh, Ninth, and Tenth Circuits have held that litigants asserting public employment discrimination claims against their state and local government employers cannot rely on Title II. Brumfield v. City of Chicago, 735 F.3d 619, 626 (7th Cir. 2013); Mary Jo C. v. N.Y. State & Local Ret. Sys., 707 F.3d 144, 171 (2d Cir. 2013);[7] Elwell v. Okla. ex rel. Bd. of Regents of the Univ. of Okla., 693 F.3d 1303, 1313 (10th Cir. 2012); Zimmerman v. Or. Dep't of Justice, 170 F.3d 1169, 1178 (9th Cir. 1999). In addition, the Third and Sixth Circuits "have expressed the view that Title I is the exclusive province of employment discrimination within the ADA."  Elwell, 693 F.3d at 1314 (citing Menkowitz v. Pottstown Mem'l Med. Ctr., 154 F.3d 113, 118-19 (3d Cir. 1998), and Parker v. Metro. Life Ins. Co., 121 F.3d 1006, 1014 (6th Cir. 1997)).  Only the Eleventh Circuit has reached a contrary conclusion.  Bledsoe v. Palm Beach Cnty. Soil & Water Conservation Dist., 133 F.3d 816, 820 (11th Cir. 1998).

---

[7] The Second Circuit limited its holding to employers with at least fifteen employees because Title I defines "employer" as "a person . . . who has 15 or more employees."  Mary Jo C., 707 F.3d at 167 n.9, 171 & n.12 (quoting 42 U.S.C. § 12111(5)(A)). The other three circuits did not.

30

We join the majority view.  The Second, Seventh, Ninth, and Tenth Circuits' thorough analysis of the ADA's text and structure, both of which support the more limited reading of Title II's scope, is persuasive.  See Brumfield, 735 F.3d at 624-29; Mary Jo C., 707 F.3d at 168-72; Elwell, 693 F.3d at 1306-14; Zimmerman, 170 F.3d at 1172-79.  As these courts have explained, the phrase "services, programs, or activities" in Title II most naturally refers to an entity's outputs provided to the public rather than its inputs, such as employees. Brumfield, 735 F.3d at 627; Mary Jo C., 707 F.3d at 167-68; Elwell, 693 F.3d at 1306; Zimmerman, 170 F.3d at 1174.  And unlike Section 504 of the Rehabilitation Act, which extends to employment discrimination claims by broadly defining "program or activity" to mean "all of the operations" of a state or local government, Title II does not provide a special definition for "services, programs, or activities."  Compare 29 U.S.C.A. § 794(b)(1)(A) with 42 U.S.C. § 12131.

Title II does, however, define "qualified individual" to mean "an individual with a disability who, with or without reasonable modifications . . . meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity."  42 U.S.C. § 12131(2).  In contrast, a "qualified individual" under Title I is "an individual who, with or without reasonable accommodation,

31

can perform the essential functions of the employment position."
Id. § 12111(8). Interpreting Title II not to cover employment
thus gives effect to Congress's decision to define the term of
art "qualified individual" differently in Title I and Title II.

In terms of structure, courts in the majority have noted
that Congress divided the ADA's prohibitions on discrimination
against individuals with disabilities into three parts, each
with its own heading: Title I for employment, Title II for
public services, and Title III for public accommodations. Mary
Jo C., 707 F.3d at 169; Elwell, 693 F.3d at 1309; Zimmerman, 170
F.3d at 1176. To read Title II to cover employment would
"diminish[], duplicate[], even render[] superfluous" Title I.
Elwell, 693 F.3d at 1309. That Title I and Title II should
encompass distinct spheres is further supported by Congress's
decision to delegate authority to promulgate regulations to the
Equal Employment Opportunity Commission under Title I, but to
the Attorney General under Title II. Mary Jo C., 707 F.3d at
169-70 (comparing 42 U.S.C. § 12116 with § 12134(a)); Elwell,
693 F.3d at 1309 (same); Zimmerman, 170 F.3d at 1178 (same).

Lastly, Congress expressly cross-referenced Title I, but
not Title II, when mandating the standards that apply to
employment discrimination claims brought under Section 504 of
the Rehabilitation Act. 29 U.S.C.A. § 794(d). This provides
strong evidence of Congress's view that Title I, but not Title

32

II, covers employment.  Elwell, 693 F.3d at 1312; Zimmerman, 170 F.3d at 1178.

Based on the text and structure of Title II and the ADA, we agree with the majority of circuits to have considered the question that Title II unambiguously does not provide a vehicle for public employment discrimination claims.  The Eleventh Circuit in Bledsoe reached the opposite view after a cursory recitation of part of Title II's text, no analysis of the ADA's structure, and heavy reliance on legislative history and the Attorney General's regulations.  133 F.3d at 820-23.  However, our conclusion that Title II is unambiguous means that we do not reach legislative history or regulations.  Dep't of Housing & Urban Dev. v. Rucker, 535 U.S. 125, 132 (2002) ("[R]eference to legislative history is inappropriate when the text of the statute is unambiguous."); Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-43 (1984) ("If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.").

Our previous cases do not compel a different result.  In Rogers, we did not reach the appellee's alternative argument that the appellant could not use Title II to bring his discrimination claim against his state employer.  Instead, we affirmed dismissal for failure to state a claim based on the

33

appellee's primary argument that "the ADA does not require [a state] to provide the same level of benefits for mental and physical disabilities in its long-term disability plan for state employees." Rogers, 174 F.3d at 436. For purposes of that case, we implicitly assumed, but did not decide, that Title II covered employee benefits. And in Doe, the appellant advanced his claim against his state employer under both Section 504 of the Rehabilitation Act and Title II of the ADA. 50 F.3d at 1262. Thus, we had no occasion to decide whether the appellant could have used Title II alone. Here, in contrast, Reyazuddin alleges that the County's 2012 conduct violated only Title II and not the Rehabilitation Act. J.A. 51-52.

Because we hold that public employment discrimination claims may not be brought under Title II, we affirm the district court's summary judgment order on Reyazuddin's Title II claim.[8]

---

[8] Reyazuddin also contends that the County had an obligation when first purchasing new software to ensure that it was accessible to employees with disabilities "to the maximum extent feasible." Appellant's Br. at 32 (quoting 28 C.F.R. § 35.151(b) (2014) and citing 42 U.S.C. § 12183(a)(2)). She borrows this standard from regulations promulgated by the Attorney General to implement Title II of the ADA. See 28 C.F.R. § 35.101. Reyazuddin does not argue that the County's asserted obligation arises under the Rehabilitation Act alone, but instead posits that "Title II rules and regulations apply to Section 504." Appellee's Br. at 30. However, our holding that Reyazuddin cannot use Title II to bring a claim against the County forecloses this argument.

IV.

For the reasons given, the district court's judgment is affirmed in part and reversed in part, and the case is remanded for further proceedings.

<u>AFFIRMED IN PART,</u>
<u>REVERSED IN PART,</u>
<u>AND REMANDED</u>