**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 24-1141**

---

STEPHANIE M. REDDING

        Plaintiff – Appellant,

v.

KRISTI NOEM, Secretary of Homeland Security, in her official capacity for the Department of Homeland Security

        Defendant – Appellee.

---

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria.  David J. Novak, District Judge.  (1:23−cv−01325−DJN−JFA)

---

Argued:  December 9, 2025                Decided:  March 3, 2026

---

Before WILKINSON, KING, and GREGORY, Circuit Judges.

---

Affirmed by published opinion. Judge Wilkinson wrote the opinion, in which Judge King and Judge Gregory joined.

---

**ARGUED:**  Theresa Dawn Truitt Kraft, WTK & ASSOCIATES LLP, Washington, D.C., for Appellant.  Kirstin O'Connor, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee. **ON BRIEF:** Jessica D. Aber, United States Attorney, Yuri S. Fuchs, Assistant United States Attorney, Hugham Chan, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee.

WILKINSON, Circuit Judge:

Plaintiff-Appellant Stephanie Redding, a former Federal Air Marshal ("FAM"), brought suit against the Transportation Security Administration ("TSA") under the Rehabilitation Act, alleging a failure to accommodate her numerous medical conditions. But far from neglecting its statutory duties, TSA repeatedly engaged with Redding to identify solutions to keep her employed within the federal government. These efforts culminated in Redding's transfer to the Federal Law Enforcement Training Centers ("FLETC")—a position she self-selected for reassignment.

Redding now claims that TSA should have kept her permanently in the temporary "light duty" position she held when reassignment became necessary. The district court dismissed this suit on the basis that Redding had not adequately pled that she was a "qualified individual" capable of performing her desired job's essential functions. And indeed, both because Redding conceded this inability and because TSA already provided reasonable accommodations, we now affirm.

I.

We hear this case on a Rule 12(b)(6) motion to dismiss and therefore take the well-pleaded facts in Redding's complaint as true; we "do not consider evidence beyond that pleading." *Stanley v. City of Sanford*, 145 S. Ct. 2058, 2062 (2025). The facts pled are as follows.

For over seven years, Redding worked as a FAM within the Federal Air Marshal Services ("FAMS") division of TSA. When she was originally hired in 2011, Redding

2

provided TSA with documentation of her "Degenerative Progressive Myopia (Severe Myopia) and Keratoconjunctivitis Sicca (Chronic Dry Eyes)," noting that "her uncorrected vision was poor." J.A. 8. But, after a preemployment medical examination, TSA determined that Redding could perform the duties of a FAM.

During the course of employment, Redding developed a number of other medical conditions, including cardiac issues, borderline pulmonary hypertension, hypoglycemia, and a type of chronic muscle and nerve pain. This worsening led TSA to place Redding on extended periods of "temporary 'light duty' status," during which she was "restricted from performing the normal duties as an FAM." J.A. 8. And, from March 2016 to May 2018, Redding served as a Regional Coordinator in the Aviation Programs Branch—a "ground-based" assignment that "required [her] to fly in 'mission status' only once per month," substantially less than a typical FAM. J.A. 8–9. A sizable portion of this tenure was formally considered "light duty." J.A. 8; *see* Oral Arg. at 17:18–17:26.

In April 2017, Redding completed a TSA-mandated biannual physical examination and provided various supplemental medical information to the agency's medical examiner. Later that summer, TSA informed Redding of "concerns that her uncorrected vision no longer met the requirements for duty." J.A. 9. And, in January 2018, the agency sent her a formal memorandum with the subject line, "Inability to Perform Essential Duties of Your Position/Inability to Meet FAMS Medical Standards."[1] J.A. 11, 319. The memorandum

---

[1] While the complaint itself does not detail exactly which essential duties Redding could not perform, the parties both appear to agree that the complaint is inherently (Continued)

3

notified Redding that her medical evaluation results could result in termination from her position and accordingly recommended that she seek reassignment to a different position within TSA or another federal agency.

Redding took this recommendation in stride and submitted a request for accommodation, seeking reassignment to a "retirement position not affected by medical restrictions." J.A. 11. Notably, in her request, she acknowledged her "inability to perform the essential duties of [her] current position." J.A. 11. Shortly thereafter, the agency informed Redding that there were no vacant TSA positions that could accommodate her. So Redding identified two potential vacancies in FLETC—a division of the Department of Homeland Security distinct from TSA. J.A. 12.

Her reassignment to FLETC as a Law Enforcement Specialist was granted on May 27, 2018, and TSA closed her accommodation case several days later. After this time, Redding began to experience "difficulty with the conditions of the assignment to FLETC," in part due to "a new condition that would require surgery," and "began having conversations with [FLETC] personnel regarding how to request reconsideration of the reassignment as an accommodation." J.A. 13. In July 2019, Redding contacted the TSA accommodation office, which advised that it could not assist her as she was no longer a TSA employee. J.A. 12–14.

---

referring, at least in part, to Redding's inability to meet TSA's standards for flight missions. *See* Oral Arg. at 06:41–07:02, 16:16–16:22.

In July 2022, Redding filed a complaint putting forth a failure-to-accommodate, disability-discrimination claim under the Rehabilitation Act. The district court dismissed the complaint for failure to state a claim, determining that Redding had failed to "plausibly ple[a]d that she [wa]s a qualified individual." J.A. 459. Redding timely appealed.

## II.

The Rehabilitation Act and its cousin, the Americans with Disabilities Act ("ADA"), set precise standards governing when, for whom, and what accommodations are appropriate. Generally speaking, the Rehabilitation Act protects a "qualified individual with a disability" from, "solely by reason of her or his disability, be[ing] excluded from the participation in, be[ing] denied the benefits of, or be[ing] subjected to discrimination . . . under any program or activity conducted by any Executive agency." 29 U.S.C. § 794(a). And, by its very terms, the Rehabilitation Act adopts the standards set forth in Title I of the ADA. *Id.* § 794(d).

Not all individuals with disabilities are entitled to reasonable accommodations under this system. Indeed, a "qualified individual" is only one who, "with or without reasonable accommodation, can perform the *essential functions* of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8) (emphasis added). Indeed, a pilot's reasonable accommodation could not be that they never fly a plane, nor could a deep-sea fisherman's reasonable accommodation be that they never go out on the water. Activities that are so "fundamental" to the job are nonnegotiable. 29 C.F.R.

5

§ 1630.2(n)(1). A reasonable accommodation can help an employee fulfill a core responsibility that she could not do otherwise, but it cannot eliminate the duty completely.

It is not the province of employees or this court to prescribe the "essential functions" of an agency job. To allow such intrusion would spread confusion in federal employment. Job descriptions would become constantly mutable, subject to extreme variation from the actual intentions and goals of the employer. It is thus the expertise and judgment of the employer that ultimately merit "considerable deference." *Elledge v. Lowe's Home Ctrs., LLC*, 979 F.3d 1004, 1009 (4th Cir. 2020) (internal quotation marks omitted) (quoting *D'Amico v. City of New York*, 132 F.3d 145, 151 (2d Cir. 1998)). Employers are intimately aware of the day-to-day work environment and how each employee fits into the mosaic of the agency's overall mission, objectives, and responsibilities. We lack the necessary expertise to second-guess such informed business judgments. *See, e.g.*, *id.*; *Lloyd v. Swifty Transp., Inc.*, 552 F.3d 594, 601 (7th Cir. 2009); *Mason v. Avaya Commc'ns, Inc.*, 357 F.3d 1114, 1119 (10th Cir. 2004). Our review is instead limited to determining whether a function "bear[s] more than a marginal relationship to the job at issue," and, even then, we give great "consideration . . . to the employer's judgment." *Tyndall v. Nat'l Educ. Ctrs., Inc. of Cal.*, 31 F.3d 209, 213 (4th Cir. 1994) (quoting *Chandler v. City of Dallas*, 2 F.3d 1385, 1393–94 (5th Cir. 1993)); 42 U.S.C. § 12111(8); *see also* 29 C.F.R. § 1630.2(n)(1), (3)(i).

Even if that an employee is a "qualified individual" able to perform a job's essential functions with reasonable accommodations, the employee may not unilaterally dictate the terms of those accommodations. Determining what accommodations are reasonable

6

involves an "informal, interactive process" between the employer and "the individual with a disability in need of the accommodation." 29 C.F.R. § 1630.2(o)(3). Such good-faith collaboration may result in various "modifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed." *Id.* § 1630.2(o)(1)(ii). And it is the employer who has the "ultimate discretion" to "reduc[e] this wide solution-space to a concrete accommodation." *Elledge*, 979 F.3d at 1011 (quoting 29 C.F.R. pt. 1630 app. § 1630.9 (2020)). The whole process is one that contemplates some give and take among the parties, some mutual recognition that the perfect may be the enemy of the good.

## III.

We review the district court's dismissal *de novo* and view the well-pleaded facts in the complaint as true. *Basta v. Novant Health Inc.*, 56 F.4th 307, 318 (4th Cir. 2022). To "survive" a Rule 12(b)(6) dismissal, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Redding's complaint fails this test: it reveals both that she is not a qualified individual for her desired Regional Coordinator position and that TSA did in fact provide reasonable accommodations.

7

A.

For starters, Redding admits in her complaint that "reassignment was requested due to the *inability to perform the essential duties* of [her] current [Regional Coordinator] position." J.A. 11 (emphasis added). This admission is a damaging one. *See Cleveland v. Pol'y Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999) ("[A] plaintiff's sworn assertion in an application for disability benefits that she is, for example, 'unable to work' will appear to negate an essential element of her ADA case . . . ."); *accord. Stanley*, 145 S. Ct. at 2065.

Redding's principal argument on appeal is that TSA should have permanently reassigned her to the Regional Coordinator position. *See* Oral Arg. at 11:50–12:03. But TSA cannot be required to do so when Redding concedes an inability to fulfill the necessary responsibilities of *that exact position* even with existing accommodations. Even Regional Coordinators in the Federal Air Marshal Service are required to be "mission ready" to perform regular flight duties, as Redding acknowledges. *Id.* at 18:05–18:20; J.A. 9. This was a function that due to her deteriorating medical conditions, including poor eyesight, Redding was unfortunately unable to perform. Oral Arg. at 17:40–18:04; J.A. 8–9, 11. TSA rightly assessed that no adjustments would permit Redding to perform the critical duties of this role—a point which Redding's complaint does not appear to contest. *See* J.A. 11–12 ("There is no paperwork suggesting that [the Regional Coordinator] position, with or without accommodations, would be an appropriate alternative to her position as an FAM."). Put simply, Redding essentially pleads that she is not a "qualified individual" for the permanent Regional Coordinator job that she seeks, and thus her failure-to-accommodate claim fails on its own terms.

8

B.

Even assuming *arguendo* that Redding could perform the essential duties of a normal FAM or Regional Coordinator, TSA already provided reasonable accommodations by reassigning her to FLETC. Redding claims on appeal that the FLETC reassignment was unreasonable because she experienced difficulties in that role, and because TSA could have kept her in the Regional Coordinator role permanently, even if she could not perform flight missions. *See* Oral Arg. at 03:20–04:22, 11:50–12:03; Opening Br. at 15–16.

Redding wrongly assumes, however, that she can dictate the core responsibilities of her desired job. As aforementioned, "the decision about a position's essential functions belongs, in the first instance, to the employer." *Elledge*, 979 F.3d at 1009. Such deference is especially important when employees act, as here, within law-enforcement and national-security enterprises. Agencies in these fields must ensure that their employees remain mission ready at a moment's notice. Significant interference with the agency's ability to dictate what baseline criteria an employee must meet could have adverse effects on our government's response to critical emergencies. Indeed, FAMS's role would be materially diminished if law forbade it from requiring that employees execute airborne law-enforcement activities. "Air" is literally in the agency's name.

Considering its discretion in this sphere, TSA has been measured and reasonable in applying its understanding of the essential-functions standard to Redding. First, it determined that Redding could not perform the essential responsibilities of a normal FAM and thus put her on temporary "light duty" status with more limited essential functions. Then, when she could no longer perform even those adjusted duties, the agency looked to

9

see if Redding could perform the essential functions of any other vacant positions within FAMS or TSA. When it determined that she could not, TSA finally began collaborating with Redding on reassignment to another federal agency.

This progression is wholly consistent with our caselaw and the Equal Employment Opportunity Commission's guidance that reassignment be a measure of "last resort," required only when "(1) there are no effective accommodations that will enable the employee to perform the essential functions of his/her current position, or (2) all other reasonable accommodations would impose an undue hardship [on the employer]." *Wirtes v. City of Newport News*, 996 F.3d 234, 240–41 (4th Cir. 2021) (alteration in original) (emphasis omitted) (quoting EEOC, *Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act*, No. 915.022, 2002 WL 31994335, at *20 (Oct. 17, 2002)); *see also Elledge*, 979 F.3d at 1014.

We are sympathetic to Redding's medical struggles and resulting hardships. But throughout this whole process, TSA collaborated and communicated with Redding in good faith. Interactive process under the Rehabilitation Act does not guarantee an employee their desired outcome. *See Reyazuddin v. Montgomery Cnty.*, 789 F.3d 407, 415 (4th Cir. 2015). Rather, it gives them a meaningful voice in such process. Redding had that voice; she self-selected her reassignment to FLETC. She now comes back, over a year after reassignment, dissatisfied with her selection. But dissatisfaction does not amount to a failure to accommodate. The very nature of placing "ultimate discretion" in the hands of the employer ensures that employees may, on occasion, disagree with accommodation decisions. *Elledge*, 979 F.3d at 1011. But so long as an employer identifies a "reasonable"

10

"alternative" to the employee's preferred accommodation, we have no grounds on which to reject that determination. *Reyazuddin*, 789 F.3d at 415. Here, reassignment to FLETC was manifestly reasonable, and that is where our analysis ends.

Certainly, if Redding continues to experience disability-related difficulties in her FLETC position, she may request from FLETC other reasonable accommodations to aid in the performance of the essential functions of this *new* role. But TSA is no longer part of the equation because it is no longer Redding's employer. TSA's obligations to Redding ceased when they facilitated the reassignment. The Rehabilitation Act does not permit Redding to link all her current and future difficulties to TSA's accommodation decision.

## IV.

Redding comes to us seeking yet another bite at the apple, but the accommodation process must end somewhere. The law does not permit plaintiffs to burden employers with Rehabilitation Act and ADA claims when all the evidence points in the same direction: the employee conceded ineligibility, and the employer provided reasonable accommodations and interactive process at every step along the way. We must thus affirm the district court's dismissal of Redding's complaint.

*AFFIRMED*