In the

# United States Court of Appeals
## For the Seventh Circuit

––––––––––––

No. 07-2068

JOSEPH M. BELLINO,

*Plaintiff-Appellant,*

*v.*

MARY E. PETERS, Secretary,
United States Department
of Transportation,

*Defendant-Appellee.*

––––––––––––

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 04 C 7686—**Arlander Keys**, *Magistrate Judge.*

––––––––––––

ARGUED FEBRUARY 15, 2008—DECIDED JUNE 19, 2008

––––––––––––

Before FLAUM, WOOD, and EVANS, *Circuit Judges.*

FLAUM, *Circuit Judge.* This case stems largely from a knee injury Joseph M. Bellino suffered while tracking planes in the air-traffic-control tower of Chicago's O'Hare International Airport. As is relevant here, there are two kinds of air-traffic controllers: those who coordinate the planes' movements from a remote location via radar and those who, like Bellino, coordinate the planes' takeoffs and landings from the airport's control tower.

The latter job involves frequent movement around the tower to keep a clear line of sight, and Bellino's injury made this hard to do.

When Bellino requested an accommodation, his supervisors at the Federal Aviation Administration offered to staff him in front of the radar instead, a job he had performed for years before moving to the tower. But Bellino refused, and a few years later, this lawsuit followed. Bellino alleged below that the FAA violated the Rehabilitation Act by failing to reasonably accommodate his disability, by retaliating against him for filing complaints with the EEOC, and by creating a hostile work environment. After discovery, the district court held otherwise, granting the Secretary's motion for summary judgment. We agree with that decision and thus affirm.

## I.  Background

Bellino has worked as an air-traffic controller off and on since 1968. For most of his tenure, Bellino worked near Chicago's O'Hare International Airport at the terminal radar approach control center, known by the acronym TRACON. When planes are within a thirty- to fifty-mile radius of O'Hare, the TRACON is responsible for guiding their movements via radar. To do so, controllers sit in front of radar monitors while coordinating the traffic overhead. When a landing plane is within five miles of the runway, controllers in O'Hare's control tower take over and bring the plane in. This process works in reverse for takeoffs. *See generally* Federal Aviation Administration, *Fact Sheet: Co-Located TRACONS* (Terminal Radar Approach Control), http://www.faa.gov/news/

fact_sheets/news_story.cfm?contentkey=4009 (Mar. 24, 2006) (last visited June 2, 2008).

During the period at issue, the tower differed from the TRACON in two relevant respects: Tower controllers received a 10% annual bonus, called controller incentive pay, whereas O'Hare's TRACON controllers only received a 1.6% bonus.[1] And the tower's controllers largely monitored the planes the old-fashioned way—visually. This latter difference meant that the controllers were constantly on the move around the tower. A controller would have to run from one end of the tower to the other to track a plane, sidestepping colleagues and the various obstacles that may lie in the way. Or, as the need arose, a controller would have to perch himself on a stool or a box to maintain a clear line of sight over the heads of his colleagues. The job was, in short, more physically demanding than watching the radar remotely.

In 2001, the FAA granted Bellino's request to move from the TRACON to the O'Hare tower. And in September 2002, while tracking a plane from atop a stool, Bellino fell and aggravated a knee injury that he had suffered years before, eventually causing both knees to give out. After surgery on his knees and a few months of

---

[1] The exact bonus earned at the TRACON is not clearly set out the record. The parties agree that the amount was 1.4%. The magistrate, crediting the "documentary evidence," instead found 1.6% to be right. The difference between the two is inconsequential; either way the bonus at the TRACON was much less than that offered in the tower. Accordingly, we adopt the percentage found by the magistrate for purposes of this opinion.

recovery, Bellino returned to work in April 2003. Upon his return, Bellino requested a "reasonable accommodation" for the "partial disability" that had resulted from his injured knee. What followed over the next year-and-a-half was an overlapping (and increasingly heated) series of disputes between Bellino and his supervisors at the FAA, eventually resulting in this lawsuit.

The first dispute concerned whether Bellino could show that his knee injury constituted a "partial disability." The FAA initially responded to Bellino's April 2003 request by asking for more medical information regarding his knee. The doctor's report that Bellino had provided to the FAA didn't indicate that he had a "partial disability." So when Bellino claimed as much, his supervisors requested a doctor's report to confirm his claim. Bellino responded in a May 2003 letter that he could not get an accurate medical assessment of his ability to return to work because the FAA's "position description" for his duties was inaccurate. The air-traffic controllers' union and the FAA had negotiated a "position description" for all the air-traffic controllers nationwide, and the FAA had provided this description for purposes of Bellino's initial medical examination. But the description doesn't indicate whether an air-traffic controller moves around or sits all day. Bellino claimed that without a description of his duties in the tower, he could not get an evaluation that would accurately assess his ability to return to work.

This basic dispute continued over the ensuing months. The FAA exhibited a good deal of suspicion over Bellino's claimed disability, and Bellino displayed increasing frustration in the "position description" the FAA provided. An April 2003 medical report said that Bellino could only work four-hour days, but said nothing about

a "partial disability." A few months later, Bellino's supervisors requested more specific information, but none was forthcoming. In October 2004, Bellino's supervisor sent him a letter stating that a subsequent report from another doctor did not indicate that Bellino "me[t] the regulatory requirements for reasonable accommodation." And the FAA never did provide a more specific "position description" to Bellino's doctors.

At the same time, Bellino and the FAA also could not agree on a "reasonable accommodation." The parties continue to dispute exactly what accommodation the FAA even offered to Bellino, even though as will be seen there is no real dispute. Following his return in April 2003, Bellino filed an equal employment opportunity ("EEO") complaint alleging that the FAA had failed to offer him any accommodation. He claimed that he had requested a transfer to the TRACON, but a supervisor had denied the request. In a November 2003 affidavit submitted as part of an EEOC complaint, Bellino repeated this same claim. Bellino also sent his supervisors letters in May 2003, April and June 2004, and October 2005. Each letter asked why he had not received a reasonable accommodation, though the letters dealt more with the on-going dispute over the "position description" and medical evaluations than with the specifics of the accommodation.

The FAA sets out a starkly different version of events. It claims that, from the outset, Bellino's supervisors in the tower offered to return him to the TRACON, albeit with the lower TRACON bonus instead of the 10% bonus earned at the tower. Bellino's union representative, who negotiated on Bellino's behalf, testified in his deposition that the "only issue [the parties] ever had" was that the

FAA "would send him back [to TRACON] but only at the [lower bonus rate] of 1.6 percent." And an October 2004 letter from a supervisor to Bellino stated "[s]ince the Tracon . . . is in need of air traffic controllers, I will offer you, again, this opportunity to return to the Tracon . . . if you wish. Your pay will be adjusted to reflect the pay for the facility and the location. Therefore, your [bonus] will be reduced." In other words, the FAA says that an offer to transfer Bellino to the TRACON has always been on the table, but Bellino wanted to take the higher bonus with him.

As the months passed, Bellino also came to believe that the FAA was retaliating against him for the several EEO complaints he had filed with the Department of Transportation since returning to work. Bellino first filed a complaint against the FAA in May 2003, followed by two more in March and August 2004. In them, he described a campaign of retaliation that the FAA had allegedly undertaken and said that these same acts created a hostile work environment.

Bellino first alleged that the FAA had denied a request for "administrative duties" as retaliation for his EEO claims. In his request for an accommodation in April 2003, Bellino had asked to be assigned "administrative duties" as one alternative. Based on its contract with the union, the FAA would occasionally assign these duties to controllers who had lost their medical clearance to work in the tower. "Administrative duties" are short-term assignments, which included answering phones or other odds and ends short of monitoring the skies. The FAA denied this request and also denied a later request for these duties that Bellino made in June 2004.

Bellino's March 2004 EEO complaint cited the FAA's intransigence in providing a "position description" as another form of retaliation. And finally, Bellino claimed the FAA improperly revoked his medical clearance. In June 2004, Bellino gave a note to a supervisor asking for leave "so that I do not place aircraft and personnel in an unsafe situation." His supervisor forwarded the note to the flight surgeon, who decided to temporarily revoke Bellino's medical clearance. Bellino's July 2004 EEO complaint alleged that this revocation was instead meant as punishment for Bellino's prior EEO claims.

In two Final Agency Decisions, the Department of Transportation rejected all of Bellino's claims. Bellino did not appeal the agency's decisions, instead filing this case in the Northern District of Illinois in February 2005. His amended complaint named Secretary Mineta as the defendant and repeated the claims he had raised before the Department of Transportation: failure to provide a reasonable accommodation, retaliation, and a hostile work environment. The parties consented to proceed before a magistrate, and, after discovery, the parties filed cross-motions for summary judgment. As it turns out, before the magistrate issued his decision, Bellino accepted a position to work "at the TRACON in a sit-down position that meets his medical restrictions." Subsequently, in a balanced and comprehensive opinion, the magistrate granted the Secretary's motion for summary judgment and denied Bellino's. This appeal followed.

## II. Discussion

Bellino repeats on appeal the same claims that he raised below, namely that the FAA failed to reasonably

accommodate his disability; that the FAA retaliated against him for filing EEO complaints; and that the same acts were harassment that produced a hostile work environment. Because this comes to the Court on a motion for summary judgment, we review the magistrate's decision de novo and construe ambiguities in the record in the light most favorable to Bellino. *Garg v. Potter*, 521 F.3d 731, 735 (7th Cir. 2008). The following sections discuss each of Bellino's claims in turn.

## A. Reasonable Accommodation

The Rehabilitation Act of 1973 incorporates the prohibitions contained within the Americans with Disabilities Act, 29 U.S.C. §§ 791(a), (g), and requires federal agencies like the FAA to offer "reasonable accommodation" to "qualified individuals with a disability." *Id.*; 42 U.S.C. § 12112(b)(5)(A) (2006). Otherwise, the agency has discriminated against that person based on his disability and will be liable. 42 U.S.C. § 12112(b)(5)(A). To make this claim, a plaintiff must show that the employer had notice of his disability and still refused to take action that could have kept him working. Or, in the words of the ADA, Bellino has to show that (1) his knee injury makes him a "qualified individual with a disability"; and (2) the FAA knew of the disability; but (3) nonetheless failed to make a "reasonable accommodation."[2] *EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 797 (7th Cir. 2005). As to this

---

[2] In evaluating Bellino's claim, we look to our cases under the Americans with Disabilities Act, which Congress has told us to credit in evaluating "complaint[s] alleging nonaffirmative action employment discrimination under" the Rehabilitation Act. 29 U.S.C. § 791(g).

last point, a "reasonable accommodation" is one that "effectively accommodates the disabled employee's limitations," *id.*, such as an employer's offer of a "reassignment to an open position." 42 U.S.C. § 12111(9).

The district court held that Bellino was in fact disabled but nonetheless dismissed his claim because he had refused the FAA's offer to transfer him to the TRACON, which was a "reasonable accommodation." On appeal, however, it's unnecessary to pass on whether Bellino was a "qualified individual with a disability." Because he rejected the FAA's offer of a "reasonable accommodation," his discrimination claim fails regardless whether he is actually disabled.

Bellino's basic claim has changed a number of times between his EEO complaints, the district court, and now here on appeal. In his original EEO complaint following his return to the tower in April 2003, he said that the FAA refused to let him transfer to the TRACON when he had asked. He even called such a transfer a "no-brainer" as far as reasonable accommodations go. Then during this litigation, he said that, even if he had been given such an offer, the TRACON jobs were not all "sit-down jobs" that would accommodate his knee injury. Also, he claims that the FAA almost immediately rescinded any offer it made to move him to the TRACON. And any move would have required him to undergo additional training, which he was physically unable to perform. He also claims that his supervisor never really gave him an offer of "reasonable accommodation" because she concluded that Bellino did "not meet the regulatory requirements for reasonable accommodation" even though she offered to transfer him to the TRACON.

But these claims are all unavailing. The evidence adduced below shows at a minimum that in October 2004 Bellino received an offer to move to the TRACON at the

lower bonus level, which he denied. The October 21, 2004 letter to Bellino from his supervisor could not have been clearer:

> Since the Tracon [sic] in Elgin, IL is in need of air traffic controllers, I will offer you, again, this opportunity to return to the TRACON . . . if you wish. Your pay will be adjusted to reflect the pay for the facility and location. Therefore, your [annual bonus] will be reduced.

The letter then set out two check-boxes for Bellino to mark. The first said "I accept the position at . . . TRACON." And the second said "I reject the position at . . . TRACON and want to continue training at O'Hare Air Traffic Control Tower." The letter concluded by asking Bellino to "return this form with the appropriate aforementioned option checked off." After initially denying in his deposition both that he had ever seen this letter and that the FAA had offered him such a transfer—the latter of which had formed the entire basis for his dispute with the FAA—Bellino issued an errata sheet saying that he had in fact received the letter. Return correspondence from Bellino to his supervisor dated October 22, 2004 confirms as much. There, Bellino said that he was "in receipt of [her] letter." He went on to characterize his supervisor's offer as an "order to report to work at the Chicago O'Hare Tower," accused her of "abusing [her] authority," and vowed to "seek redress through the U.S. District Court in the near future." Bellino claims that his supervisor rescinded this offer a week later, but the evidence does not so indicate.

This back-and-forth suffices to show that no genuine issue of fact could exist as to whether the FAA offered Bellino an open position at the TRACON. So the only issue is whether this offer was a "reasonable accommoda-

tion," and we hold that it was. Bellino testified in his deposition that the TRACON position would have been a "reasonable accommodation," saying that had he been offered a position in the TRACON, he would have "[a]bsolutely" accepted. And Bellino's union representative called a transfer to the TRACON a "no-brainer" because it was a job where Bellino "could sit [and] didn't have to walk." They offered these characterizations for good reason. The salary, duties, and responsibilities attending the two positions were identical. Here, Bellino argues that the TRACON job was not guaranteed to be a sit-down job, but no evidence supports this claim. When specifically asked in his deposition whether the "Elgin TRACON is a sit-down position," he responded "it is," without the qualifications he has tried to give this fact in court. He even characterized the TRACON as a sit-down position in a letter he wrote to his congressman seeking assistance in his ongoing dispute, calling the TRACON position one "that would not require him to stand and move about." Not to mention the fact that he works there today, "in a sit-down position that meets his medical restrictions."

Given the identical salaries, geographic proximity to each other, and the similarity of their responsibilities, the only real difference between the two was the annual bonus. On appeal, Bellino (contrary to his union representative's assessment) denies that this dispute ever had anything to do with the different bonuses. Accordingly, we have no occasion to decide whether this difference should factor into the reasonable accommodation calculus, though our precedent strongly suggests that it would not. *See Gile v. United Airlines, Inc.*, 213 F.3d 365, 374 (7th Cir. 2000) (stating that employer must consider "transferring the employee to any of these other jobs, including those that would represent a demotion."); *Dalton*

*v. Subaru-Isuzu Automotive, Inc.*, 141 F.3d 667, 678 (7th Cir. 1998) (same). In sum, the TRACON and the tower jobs were functionally identical save that the former did not require Bellino to physically move around to track the planes, that is, it accommodated his disability.

Bellino's final claim with respect to the proposed accommodation is that it came only after a breakdown in the interactive process. This claim fails because the FAA did in fact offer him a reasonable accommodation in October 2004, and when an employer has done that, the "failure to engage in the interactive process by itself does not give rise to relief." *Ozlowski v. Henderson*, 237 F.3d 837, 840 (7th Cir. 2001); *Rehling v. City of Chicago*, 207 F.3d 1009, 1015-16 (7th Cir. 2000); *Sieberns v. Wal-Mart Stores, Inc.*, 125 F.3d 1019, 1023 (7th Cir. 1997). Because it is indisputable that the FAA in fact offered a reasonable accommodation, it is unnecessary to pass over the quality of the interactive process that produced that accommodation. *Ozlowski*, 237 F.3d at 840.

### B. Retaliation

Bellino points to three actions by the FAA that, he claims, constituted retaliation for his EEO complaints: (1) the FAA's refusal to give an accurate "position description"; (2) the denial of "administrative duties"; and (3) the withdrawal of his medical clearance.[3] He claims the FAA retaliated against him both for his own EEO

---

[3] Bellino's brief cites these as only the "most significant[ ]" adverse employment actions, not including those others "detailed in the . . . [f]acts." This last part is not an argument, FED. R. APP. P. 28(a)(9)(A), and so we do not consider any other grounds that may exist in the facts.

complaints and for those that he filed on behalf of his co-workers over the years. To prove retaliation, Bellino chose the indirect method of proof, which requires a prima facie showing that (1) his EEO complaints were protected activity; (2) the FAA subjected him to an adverse employment action; (3) he performed his job satisfactorily; and (4) a similarly situated employee who did not file an EEO complaint was treated more favorably. *Burks v. Wisconsin Dept. Of Transp.*, 464 F.3d 744, 758 (7th Cir. 2006). If Bellino made this showing, the burden would shift to the FAA to articulate some legitimate reason for its action, after which Bellino would have to show that this reason was a lie to cover for discrimination. *Id.*

But Bellino cannot establish his prima facie case because he has not pointed to a single similarly situated individual. The only actual name offered by Bellino on appeal is that of a co-worker, Anna Von Werder, to whom, he claims, the FAA gave administrative duties when she had requested them. But, as the record shows, the FAA gave her these duties despite the fact that she had filed EEO complaints against the FAA. Because this is the "protected activity" Bellino alleges as the basis of retaliation, Von Werder is not similarly situated. Aside from Von Werder, Bellino claims in his brief only that the FAA did not give any other air-traffic controller an improper "position description," deny a request for "administrative duties," or revoke another controller's medical clearance. He does not, however, identify who these other air-traffic controllers are. Such a basic showing is necessary for a plaintiff to establish his prima facie case, *see, e.g., Kampmier v. Emeritus Corp.*, 472 F.3d 930, 938 (7th Cir. 2007); *Hoffman-Dombrowski v. Arlington*

*Intern. Racecourse, Inc.*, 254 F.3d 644, 651-52 (7th Cir. 2001), meaning Bellino has not done so here.

## C.  Hostile Work Environment

Finally, Bellino claims that the FAA's treatment of his disability created a hostile work environment. We have assumed both that the Rehabilitation Act provides such a cause of action and that the Title VII standard applies where, as here, the facts do not require us to resolve the issue in order to decide the case. *Mannie v. Potter*, 394 F.3d 977, 982 (7th Cir. 2005). In the Title VII context, we have identified four elements of a hostile work environment claim, which require, as modified: (1) the plaintiff must be the object of unwelcome harassment; (2) the harassment must be based on disability; (3) it must be sufficiently severe and pervasive so as to alter the conditions of employment; and (4) there must be a basis for employer liability. *Luckie v. Ameritech Corp.*, 389 F.3d 708, 713 (7th Cir. 2004). Bellino identifies the same alleged retaliatory acts cited above as the basis for his hostile work environment claim, adding to the list both the denial of a reasonable accommodation and the deliberate miscalculation of his salary. He argues that, when these acts are viewed together, the FAA made his working conditions intolerable because of his knee injury.

We disagree. Bellino's claim fails because none of the acts that he identifies show that the FAA harassed him because of his disability. First, as discussed above, Bellino received an offer for a reasonable accommodation, so claiming that the denial of such an accommodation was harassment is a non-starter. In addition, the denial of his

medical clearance was not meant to harass Bellino for his disability. The FAA only denied Bellino's medical clearance after he gave his supervisor a note saying "I am requesting to take the full amount of leave that can be advanced to me so that I do not place aircraft and personnel in an unsafe situation—much less myself." The flight surgeon would say later that Bellino's original note had "warranted Mr. Bellino's temporary removal from safety duties pending clarification." Bellino's medical clearance was restored two months later, and he had received worker's compensation during his absence. Contrary to Bellino's claims, removing his medical clearance after he said he would be placing planes, passengers, and personnel "in an unsafe situation" made a lot of sense. It was not an act of harassment spurred by his disability.

The FAA had similar justification for denying his request for administrative duties. Bellino's supervisor denied him these duties after his first request in April 2003 because no such duties were available. A supervisor denied his second request in June 2004—after the withdrawal of his medical clearance—because the administrative duties that were available did not meet his "doctor's current temporary restrictions." Bellino has not put forth any evidence to the contrary, let alone any evidence that his disability caused the denial. As for his pay, it is true that Bellino was at times underpaid. But Bellino's late payment occurred because he used a number of different leave categories when taking time off, a perfectly acceptable practice but one that threw the FAA for a loop. This confusion produced administrative missteps, which in turn caused under-payment. As the undisputed evidence shows, the FAA was diligent in

correcting these errors, and so calling this a form of harassment would be unwarranted.

Finally, it is true that the FAA did not give Bellino the "position description" he requested for his medical examinations. Instead, the FAA provided the position description that the union had agreed to in the collective bargaining agreement, which unfortunately was nondescript when it came to the physical demands of working in the tower. The FAA certainly could have been more cooperative in getting the appropriate position description to Bellino. Nonetheless, there is no evidence that this shortcoming was meant as harassment because of Bellino's disability. The reason the position description was relevant was to substantiate Bellino's disability. But even without this substantiation, the FAA offered Bellino an accommodation that would have allowed him to continue working. Absent some other evidence of discrimination, an offer to accommodate Bellino's disability is inconsistent with hostility on that basis. Accordingly, whether these acts are viewed seriatim or as a group, Bellino's claim cannot succeed.

## III. Conclusion

For the foregoing reasons, we AFFIRM the district court's grant of summary judgment.