GREGORY, Chief Judge, concurring in part and dissenting in part:
Hannah P. was undisputedly an excellent intelligence officer. The Office of the Director of National Intelligence ("ODNI") entrusted her with the high-stress, high-profile Edward Snowden case. She worked tirelessly and impeccably on that assignment, and ODNI praised her performance. For the duration of that assignment, Hannah kept nonconventional work hours with the knowledge and consent of her supervisors, and her attendance was not considered a problem.
It was only after the Snowden project ended, and Hannah's depression worsened, that her supervisors found fault with her work hours, though she remained formally on a flexible schedule. When Hannah requested an accommodation for her depression-a leave of absence recommended by both of her medical professionals-Hannah's supervisors refused to timely grant the request. This was despite the fact that her supervisors had offered to grant her leave just a few months earlier-before her depression was triggered.
The result of this was tragic. Hannah was denied a permanent position for which it is undisputed that she was exceptionally qualified and for which the interview panel unanimously selected her. ODNI concedes that Hannah's depression qualifies as a disability protected by the Rehabilitation Act. Yet, the employer denied Hannah, a dedicated and valuable employee, the protection that the law requires.
The majority mistakenly fails to see the force of Hannah's claims. Though the majority cites repeatedly to our decision in Vannoy v. Federal Reserve Bank of Richmond , it fails to grapple with the stark distinctions between the "blatant and persistent misconduct" by the employee in that case and Hannah's cooperative attempts to satisfy her supervisors' expectations, despite the increasingly severe symptoms of her disability. 827 F.3d 296, 300 (4th Cir. 2016).
While I concur in Parts III.A.2.a, III.A.3, and III.B.1 of the Court's opinion, I cannot agree that no genuine issue of material fact exists with respect to Hannah's claims that ODNI violated the Rehabilitation Act and Family and Medical Leave Act ("FMLA") when it discriminated against her on the basis of her disability, failed to reasonably accommodate her depression, wrongfully required a medical *349 examination of her as a current employee, and chose not to hire her for permanent employment in retaliation for her FMLA-qualifying leave. I believe that several disputes of fact exist and that Hannah is entitled to her day in court. Therefore, I respectfully dissent with respect to those claims.
I.
Hannah's supervisors were informed early in her employment that she suffered from depression. She was under the treatment of a psychiatrist and a licensed clinical social worker and did not initially request any work accommodations because she "was adequately handling [her] depression at the time with medication and counseling." J.A. 19-20.
Despite her depression, Hannah excelled at her job. In her position as the disclosures coordinator for the Edward Snowden project, her "leadership, poise, and performance were impeccable." J.A. 412. She was described by her supervisors as "an outstanding employee combining energy/drive, technical competence, superb communication and networking skills, and superior analytic tradecraft." Id. In short, Hannah was considered "an invaluable intelligence officer and a future [Intelligence Community] leader." Id.
The high-profile Snowden project required long work hours, and Hannah was not required to maintain an established "core" hours schedule. Instead, she worked a "maxi flex" schedule, which permitted her to vary her schedule so long as she put in 80 hours of work in each two-week period. J.A. 492-93. She often came in later than other ODNI employees (around noon), but stayed later as well. J.A. 494.
In November or December 2014, as the Snowden project was coming to a close, Hannah's supervisors encouraged her to take leave, a common practice for ODNI employees "after finishing a burn-out job." J.A. 173. Hannah did not take her supervisors up on the offer, however, not only because she was interviewing for permanent employment, but also because "there was still ambiguity over whether the [Snowden] disclosures responsibilities had truly finished." Id.
During this time, Hannah's depression became more serious. She had trouble arriving at work before noon and had unscheduled absences. Hannah remained on a maxi flex schedule, however, and it was not until March 19, 2015, that she was informed that her attendance and arrival time were problematic. J.A. 461, 495. In fact, her first-line supervisor had no concerns about her attendance or work hours in early 2015 and asked Hannah to fill in as acting chief of their division while he was out of the office in late February. J.A. 494-95, 498.
When Hannah's supervisor spoke with her about her work hours on March 19, 2015, Hannah was not told that she was required to return to a "core" schedule. Rather, Hannah and her first-line supervisor agreed that Hannah would either arrive at work by 10:00 a.m. or contact her supervisors if she was unable to arrive by that time; if she neither arrived at work nor contacted the office by 11:00 a.m., her supervisor would reach out to her by phone. J.A. 114. Hannah's second-line supervisor had no objection to the arrangement; he "wanted to see what would happen." J.A. 345.
The day after making this arrangement, Hannah did not report for work by 10:00 a.m. When she did not arrive by 11:00 a.m., her supervisors did not call her. Instead, she emailed them at 11:05 a.m., advising she would be in around 12:30 p.m. J.A. 118.
*350 After that work day, Hannah began a pre-scheduled week-long leave during which she was preoccupied with home renovations. J.A. 114. At the end of the week, she emailed her supervisors to inform them she would not be in Monday, the next business day, because of the renovations. J.A. 120. On Tuesday, Hannah emailed her supervisors notifying them that she would not be in that day either. J.A. 122.
On Wednesday, when Hannah did not come in by 10:00 a.m., Hannah's second-line supervisor called her. J.A. 174. According to Hannah, her supervisor was "angry" and demanded to know why Hannah had not arrived. Id. Hannah apologized, explained she was having trouble getting out of bed, and indicated that she would be in as soon as possible. Id. When she arrived at work, her supervisor told her that the arrangement they had made "was not working." J.A. 175. She was told that she was solely responsible for contacting the office in the event she would be late or absent, and that her supervisors would not be contacting her. J.A. 90. The arrangement had been in place for a total of four days on which Hannah was scheduled to work.
Hannah asked that her supervisors "give the current accommodation more time to work." J.A. 175. Her supervisor, who was aware of Hannah's depression, insisted that Hannah propose an alternative plan "right then." Id. She was ultimately given "a day or two" to propose an alternative. Id.
The next day, on April 2, 2015, Hannah emailed her supervisors at 11:02 a.m., notifying them that she would be in by noon. J.A. 124. That day, Hannah's supervisors met with ODNI's Employee Management Relations Officer, the head of ODNI's Equal Employment Opportunity and Diversity Office, and the head of ODNI's Human Resources Division to discuss how to best address Hannah's attendance and reporting. J.A. 66, 128, 149. They collectively decided to refer Hannah to the Central Intelligence Agency's Employee Assistance Program ("EAP").[1] J.A. 326-29. Although Hannah's supervisors were well aware of her depression, she was referred to the EAP to "help identify what her challenges were and provide her any support she needed," such as "accommodation with work hours, ... counseling or any other type of support." J.A. 139-40.
Hannah's supervisors drafted a memorandum, which they dated April 9, 2015, referring Hannah to the EAP. The memo outlined Hannah's "impressive capabilities" and her work with ODNI, commented on her recent attendance, and explained that Hannah had disclosed to her supervisors that she was meeting with a psychiatrist and counselor and taking medication for depression. J.A. 412-13. The memo also noted:
Hannah has indicated that she is struggling to get out of bed in the morning and admits to feeling almost paralyzed. She has also indicated that she had a recent change in medication and that the upheaval in her living arrangements negatively impacted some of her physical coping mechanisms.
J.A. 413. The memo explained that "as senior intelligence officials," Hannah's supervisors "ha[d] a duty to identify and if possible help vulnerable employees." J.A. 414.
*351 Meanwhile, Hannah met with her psychiatrist and counselor. Both professionals agreed that Hannah should take four weeks of leave. J.A. 175. Accordingly, Hannah met with her supervisors on April 9, 2015 and requested a four-week leave of absence. J.A. 424, 449, 468. Her supervisors did not ask her for any medical documentation to support the leave request because they expected to receive a "quick answer" from EAP. J.A. 95. They also believed that Hannah's medical providers did not have "the expertise to provide" an opinion on "all of the items" that they were planning to submit to EPA. Id.
Hannah's supervisors denied her leave request; they had already determined before meeting with Hannah that if Hannah asked for leave, they would "defer that decision until after meeting with EAP." J.A. 422. One of Hannah's supervisors explained in her deposition that she "wanted to get a sense [Hannah] was in a good place." J.A. 431. According to that supervisor, the "rationale" of the group that decided to refer Hannah to EAP first was:
If this were ... a bad behavior problem, there would be no need to grant immediate leave.
If it were a medical mental health problem, the thought was, granting leave and isolating [Hannah] from day-to-day contact with her coworkers and her managers when we didn't know her state of mind and how much medical care she was receiving could, potentially, be dangerous.
J.A. 422-23. Hannah's second-line supervisor told her that the decision was made because of concern that "since [Hannah] was a single woman if [she] took leave [she] would be home by [herself] and that could make [her] depression worse." J.A. 176. It was made clear that Hannah was required to attend EAP counseling; if she refused, her temporary position would be deemed "as excess" and she would lose her job "immediately." Id.
Hannah's first-line supervisor disagreed with the others' proposed course of action; he believed that the supervisors should not "substitute [their] judgment for [Hannah's] doctor's." J.A. 504. Nonetheless, Hannah signed the memo to EAP and attended an appointment with an EAP counselor the next day, April 10, 2015.
On Monday, April 13, 2015, Hannah met again with one of her supervisors to discuss her leave request. Her supervisor told her that her leave request was approved but "was pushing" her to take only two weeks off, not the four she had requested. J.A. 524, 528. He explained that Hannah would have to submit to a medical evaluation if she wished to take leave beyond the two weeks. J.A. 524. Hannah felt uncomfortable with her supervisor's pushiness and confused about the status of her leave request so she responded that her request was "on hold." Id. She wanted to figure out what the EAP counselor had told her supervisor and to confirm her legal options. Id.
Hannah continued to arrive at work later than 10:00 a.m. during April 2015. During that month, Hannah also continued attending the EAP sessions. In those sessions, Hannah testified, she was questioned about her medical history, her family's medical history, and the medication she was taking and its dosage. J.A. 531-32. In the third session, Hannah was given a diagnostic questionnaire "to assess depression or severity of those sorts of things." J.A. 534.
On April 16, 2015, the EAP counselor had an extended forty-minute discussion with Hannah's second-line supervisor. During that discussion, the counselor disclosed that Hannah's "lack of motivation/inability to come to work" was primarily influenced by feelings of frustration over not securing *352 a permanent position at ODNI. J.A. 604. At some point, the counselor also indicated that Hannah was not cooperating with the EAP process because she was spending "more than half the session at times" expressing concerns over the record retention policy. J.A. 192.
A week later, Hannah's second-line supervisor circulated a status update via email to ODNI leadership outlining the information shared by the EAP counselor. That information included Hannah's explained reasons for her inability to arrive punctually for work, as well as Hannah's concerns that the EAP process would "create a paper trail that [would] adversely impact her future employment and career." J.A. 606. The email also indicated that the EAP counselor had identified "non-medical" factors as the primary cause of Hannah's attendance problems. J.A. 607.
On April 28, 2015, Hannah met with one of her supervisors and reiterated her request for four weeks of leave. J.A. 41. She was told that her leave request would be approved if she met with the EAP counselor once more on May 1, 2015 and signed a Letter of Expectations. J.A. 42. Hannah attended the May 1 appointment and signed the Letter of Expectations on May 4, 2015. J.A. 43. The Letter of Expectations provided that, "[e]ffective immediately," Hannah would begin work by 10:00 a.m. and would contact her office no later than 9:30 a.m. in the event she would be late. J.A. 614.
Beginning on May 5, 2015, Hannah took a four-week leave of absence. She returned to work on June 1, 2015 and was immediately tasked with leading a significant study. J.A. 44-45. Her attendance problem "largely disappeared as Hannah responded to the need for daily meetings all over the community." J.A. 612.
On June 9, 2015, Hannah interviewed for a permanent position with ODNI-Program Mission Manager Cyber ("Cyber"), a job she had applied for at the end of April or beginning of May 2015. J.A. 620-21. She was unanimously selected by the interview panel as the most qualified candidate for the position. J.A. 206, 625. A week later, the interview panel forwarded its recommendation to ODNI's Chief Management Officer, Mark Ewing. J.A. 206-07. Ewing was already aware of the decision to refer Hannah to the EAP and had been consulted in that decision-making process. J.A. 216. As Ewing testified, the EAP referral was intended not only to address Hannah's issues with the temporary job she had at the time; Ewing's "concern was her conduct in relationship to being selected for a permanent government position." J.A. 217, 585.
Hannah's application for the Cyber position stalled for several weeks, despite the fact that the approval process typically only took a few days. J.A. 443, 630. On June 25, 2015, members of the interview panel began questioning the holdup. J.A. 633. In response, Ewing sent an email to the Principal Deputy Director of National Intelligence ("PDDNI") recommending that Hannah not be approved for the Cyber position based on her recent attendance history. J.A. 635-36. Ewing also represented that the EAP counselor had concluded that Hannah did not have a medical problem, "rather she is a disciplinary problem." J.A. 635.
The PDDNI shared that email with the Director of National Intelligence ("DNI"). Neither the PDDNI nor the DNI approved Hannah for the permanent position. J.A. 722. On July 7, 2015, Hannah was notified that she was not selected for the position. J.A. 638. Hannah completed her temporary term at ODNI on March 27, 2016 as a high performer, yet did not secure a permanent position with the department.
*353 II.
A.
I first take issue with the Court's treatment of Hannah's discrimination claim under the Rehabilitation Act. The majority concludes that Hannah's 13 "attendance issues" between March 19, 2015 and May 4, 2015 constituted a "significant attendance and reporting problem." Maj. Op. at 343-44. Accordingly, the majority credits this proffered legitimate, non-discriminatory reason for ODNI's failure to hire Hannah for the permanent Cyber position.[2] The majority also concludes that Hannah has failed to satisfy her burden at this stage of presenting sufficient evidence that ODNI's explanation for rejecting her application is pretext for disability discrimination. Maj. Op. 342-43.
I disagree with the majority's conclusions for several reasons. Fundamentally, ODNI's proffered reason for not hiring Hannah reflects a misunderstanding of Hannah's disability. Among the most typical symptoms of depression are a loss of interest in nearly all activities, decreased energy, disturbed or irregular sleep, and an impaired ability to function in one's daily activities, including communicating with others. Jerry Von Talge, Ph. D., Major Depressive Disorder-Essential Features , 26 Am. Jurisprudence Proof of Facts 1, § 12 (3d ed. 1994); Spangler v. Fed. Home Loan Bank of Des Moines , 278 F.3d 847, 853 (8th Cir. 2002) ("A jury could consider the difficulty one suffering from depression has with communications ...."). "Even the smallest tasks seem to require substantial effort." VonTalge, Major Depressive Disorder-Essential Features , 26 Am. Jurisprudence Proof of Facts 1, § 12. In Hannah's case, although she was taking medication to treat her depression, she was "unable to just get going." J.A. 413. She was "lethargic or almost unconcerned." Id. Her demeanor was "sad, very flat, and almost trance like." Id. Yet, Hannah came to work, and her job performance remained "excellent." J.A. 408.
In light of the nature of Hannah's disability and the record evidence, I am baffled by the majority's conclusion that her conduct amounted to a "significant attendance and reporting problem" as a matter of law. Maj. Op. at 344; see Vannoy v. Fed. Reserve Bank of Richmond , 827 F.3d 296, 300 (4th Cir. 2016) ("Summary judgment is appropriate if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." (internal citations and quotation marks omitted)). Hannah's behavior is far from the "blatant and persistent misconduct" that we have found to be lawful grounds for adverse employment actions in this context. Vannoy , 827 F.3d at 305. In Vannoy , for example, the employee, like Hannah, suffered from depression. Id. at 299. We found that Vannoy's employer had a legitimate, non-discriminatory reason to terminate his employment, despite his disability, when Vannoy had several unscheduled absences from work; drove an employer vehicle for a three-day, out-of-state work assignment and stayed at a hotel paid for by his employer, yet did not once report for duty; refused to complete his portion of a performance improvement plan; and left work without authorization. Id. at 299-300, 305. It was in that context that we explained that the Americans with Disabilities Act ("ADA") "does not require an employer to simply ignore an employee's blatant and persistent misconduct , *354 even where that behavior is potentially tied to a medical condition." Id. at 305 (emphasis added); see also 29 U.S.C. § 791(f) (incorporating ADA employment standards into section 501 of the Rehabilitation Act).
Unlike in Vannoy , the record here does not paint a picture of Hannah as an insubordinate employee who refused to cooperate with her employer and blatantly misused department resources. To the contrary, Hannah openly communicated with her supervisors, even if she did so later in the day than they had expected. She informed her supervisors of her depression and cooperated by attending the sessions with the EAP counselor. During the 46-day period between the first accommodation and Hannah's written agreement to begin work at a specified time, she had four unscheduled absences and came into work after 10:00 a.m. nine times. J.A. 556. On all but two occasions she communicated her anticipated schedule to ODNI. And on one of those two occasions, Hannah arrived by 11:00 a.m., the time after which her supervisors were to contact her. Id. During this time she actively worked with her medical professionals to design an alternative solution, and she requested, on more than one occasion, that ODNI grant the recommended leave of absence. In fact, Hannah was absent only once and arrived after 10:00 a.m. only twice before her initial leave request was denied. See id. Had her supervisors granted her leave of absence on April 9 when she first requested it, many of her attendance issues would have been avoided. A jury could reasonably conclude that Hannah's late arrivals to work continued only because her depression was not effectively accommodated. See J.A. 175 (both medical professionals recommended four-week leave); J.A. 612 (noting Hannah's attendance problem "largely disappeared" upon her return from leave). On this record, I find unfounded the characterization of Hannah's conduct as blatant and persistent as a matter of law.
Furthermore, Hannah has sufficiently shown that ODNI's proffered reason for not hiring her-her attendance problems-may be pretext for disability discrimination. At the summary judgment stage, Hannah need not conclusively prove discrimination. But she must proffer sufficient evidence from which a reasonable jury could conclude that she was in fact the victim of intentional discrimination by ODNI. Reyazuddin v. Montgomery Cty., Md. , 789 F.3d 407, 419 (4th Cir. 2015). I would find that she has met this burden for two reasons.
First, as Hannah argues, questions of fact exist as to whether her attendance was a serious problem, or whether her attendance even violated any work-hours policy. The record suggests that it was not until May 4, 2015 that Hannah was given a formal time by which to arrive at work. See, e.g. , J.A. 108 ("[D]ifferent people had different schedules ...."); id. (explaining that while most employees arrived at work around 9:00 a.m., there was no "explicit" requirement to do so); J.A. 518 (denying that a "core hours expectation" existed before September or October 2015). Although her supervisors told her on March 19, 2015 that she was to report by 10:00 a.m., they also initially agreed to contact her if she did not report by 11:00 a.m. Had the 10:00 a.m. start time been deemed a requirement, it would make little sense to have made any further arrangements. When one of her supervisors attempted to unilaterally change that arrangement, he acceded to Hannah's request for time to propose an alternative. Hannah requested the doctor-recommended leave of absence as an alternative, but she was never told that she was required to work specific hours; she remained formally on a maxi *355 flex schedule. It was not until the Letter of Expectation on May 4, 2015 that a formal start time was imposed. The department itself did not move to "core" hours until October 2015. J.A. 518. Therefore, Hannah's work schedule during the relevant time may have been "erratic," Maj. Op. 343, but a reasonable jury could conclude that it did not violate any established work-hours requirement.[3]
Second, I would find that Mark Ewing's inconsistent statements regarding his knowledge of Hannah's disability, coupled with the above evidence, are sufficient evidence of pretext to survive summary judgment. The majority emphasizes that Ewing did not have first-hand knowledge of her condition and that he was informed that her depression was under control. Maj. Op. 342-43. But depression is not like physical illnesses; it does not simply dissipate overnight. Its symptoms may be under control one day yet triggered the very next. See Sidney H. Kennedy, M.D., A Review of Antidepressant Therapy in Primary Care: Current Practices and Future Directions , Primary Care Companion for CNS Disorders, vol. 15(2), PCC.12r01420 (Apr. 11, 2013) (noting that major depressive disorder, the disease with which Hannah was diagnosed, is "chronic and episodic" in nature). Indeed, Hannah was able to control her symptoms for years while working at ODNI. Ewing was consulted by Hannah's supervisors in connection with their decision to refer Hannah to EAP. J.A. 216. The EAP memo, a copy of which Ewing possessed, explicitly stated: "[Hannah] informed us that she was meeting with a psychiatrist and counselor and taking medication for depression." J.A. 413. And the memo implicitly made the connection between Hannah's "struggling to get out of bed in the morning" and recent upheavals in her life that "negatively impacted some of her physical coping mechanisms." Id. In fact, it noted that Hannah "appear[ed] to gain more energy and become aware as the day progress[ed] into early evening." Id. On this evidence, a reasonable jury could determine that Ewing was aware that Hannah's depression affected her ability to get to work by 10:00 a.m. and required medical intervention and that Ewing's initial statement that he was unaware of her condition was intended to cover up the true reason for his desire not to hire her: her disability.
In sum, because a reasonable jury could conclude on this record that Hannah's attendance issues were far from "blatant and persistent misconduct," Vannoy , 827 F.3d at 305, and that ODNI's proffered reason for failing to hire Hannah for the Cyber position was pretext for discrimination on the basis of her disability, I would reverse the district court's grant of summary judgment on the discrimination claim.
B.
I also take issue with the Court's conclusion that no question exists as to the reasonableness of the accommodations made by ODNI. The reasonableness of an accommodation depends "on a good-faith effort to assess the employee's needs and to respond to them." Feliberty v. Kemper Corp. , 98 F.3d 274, 280 (7th Cir. 1996). Importantly, "a 'reasonable accommodation' is one that 'effectively accommodates the disabled employee's limitations.' "
*356 Bellino v. Peters , 530 F.3d 543, 549 (7th Cir. 2008) (emphasis added) (citation omitted). In identifying a reasonable accommodation, employers are required to engage in an interactive process with the disabled employee. See 29 C.F.R. § 1630.2(o)(3) ; Jacobs v. N.C. Administrative Office of the Courts , 780 F.3d 562, 581 (4th Cir. 2015) ("The ADA imposes upon employers a good-faith duty 'to engage [with their employees] in an interactive process to identify a reasonable accommodation.' " (quoting Wilson v. Dollar Gen. Corp. , 717 F.3d 337, 346 (4th Cir. 2013) )); Bellino , 530 F.3d at 548-50 (discussing ADA's interactive-process requirement in the context of claim brought under section 501 of the Rehabilitation Act). It is only if an employer provides a reasonable accommodation that the employer's failure to engage in an interactive process will not sustain a failure-to-accommodate claim. Jacobs , 780 F.3d at 581.
The majority finds that ODNI provided Hannah with two accommodations: (1) the March 19, 2015 agreement that Hannah would report for work by 10:00 a.m., and (2) the referral to EAP. Maj. Op. 337. I submit that questions of fact exist with respect to whether ODNI made a good-faith effort to respond to Hannah's needs and whether either of these accommodations was effective, i.e. , whether the accommodations were reasonable. And because a question of fact exists as to that issue, I agree with Hannah that a question also exists as to whether her employer engaged in the required interactive process.
Hannah argues that her supervisors' initial commitment to contact her if she did not contact them or arrive by 11:00 a.m. was the sine qua non of the first accommodation. But Hannah's supervisors allowed that accommodation to remain in place for only four working days before unilaterally modifying it and, according to Hannah, angrily pressuring her to propose an alternative accommodation on the spot. When Hannah did propose an alternative-four weeks of leave, as recommended by both of her treating medical professionals-her supervisors denied the request because they had already decided that EAP counseling was more appropriate. Speculating that they knew better than both of Hannah's medical professionals, her supervisors believed that her medical providers lacked "the expertise to provide" an opinion on "all of the items" they wanted to submit to the EAP. J.A. 95. And while Hannah's supervisors had suggested that she take leave a few months earlier, prior to any signs that Hannah's disability would affect her ability to get into work in the morning, J.A. 173, they threatened to terminate her employment if she did not first attend EAP sessions after she requested medically recommended leave to cope with her depression, J.A. 176. On this evidence, the question of whether the first accommodation and the decision to require EAP counseling before granting medically recommended leave were made in good faith and were effective to address Hannah's disability should be submitted to the jury, as reasonable minds could conclude that they were not.
Likewise, the reasonableness of ODNI's delay in granting Hannah leave should be decided by a jury. Concededly, the short duration of the delay (from April 9, 2015 to May 4, 2015) undercuts Hannah's argument of unreasonableness. See Terrell v. USAir , 132 F.3d 621, 628 (11th Cir. 1998) (finding that delay of three months in providing accommodation was reasonable). However, Hannah's attendance-and the manifestation of her depression-was negatively impacted during the delay period; ODNI purposefully delayed her leave while she attended required EAP sessions *357 [4] ; ODNI would have terminated Hannah's temporary position if she failed to attend the EAP counseling[5] ; and Mark Ewing intended to use the EAP sessions to gather information regarding Hannah's suitability for future employment.[6] Presented with this evidence, a reasonable jury could conclude that the delay was the result of ODNI's bad faith. Feliberty , 98 F.3d at 280. Thus, I would reverse the grant of summary judgment on Hannah's reasonable accommodation claim.
C.
I would also reverse summary judgment on Hannah's claim that she was subjected to an unlawful medical examination as a current employee.
Under the Rehabilitation Act, "[a] covered entity shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature and severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity." 42 U.S.C. § 12112(d)(4)(A) ; 29 U.S.C. § 791(f).
First, a clear dispute exists as to whether the EAP sessions constituted a required medical examination under the Rehabilitation Act. Despite the voluntary nature of EAP counseling highlighted by the majority, Maj. Op. 338, two of Hannah's supervisors testified that the sessions were in fact "mandatory." J.A. 448, 474. As Hannah explained, she was told by her supervisor that she had "no choice" in the matter and that if she did not participate in the EAP counseling, her temporary position with ODNI would be declared "as excess" and she "would be out of a job immediately." J.A. 176.
The majority emphasizes the EAP counselor's testimony that she did not conduct a medical examination. Yet, the Court's opinion says nothing about Hannah's testimony regarding the substance of her sessions with the counselor. According to Hannah, she was asked for a family medical history, questioned about her medication and dosage, and even administered a diagnostic tool used to assess depression. J.A. 531-32, 534.
In light of this testimony, a reasonable jury could conclude that the EAP sessions were in fact required and that the diagnostic tool constituted a "procedure or test that seeks information about an individual's physical or mental impairments or health." E.E.O.C., Enforcement Guidance: Disability-Related Inquiries and Medical Examinations of Employees Under the Americans with Disabilities Act (ADA) (EEOC Notice 915.002) (July 27, 2000). Likewise, a jury could determine that the questions asked during the sessions amounted to a "series of questions ... likely to elicit information about a disability" and the scope of Hannah's disability. Id. ; Grenier v. Cyanamid Plastics, Inc. , 70 F.3d 667, 677 (1st Cir. 1995). As Hannah's supervisors explained, the decision to refer her to EAP was to determine whether her *358 attendance was due to "a medical mental health problem." J.A. 422. Their decision was predicated on a concern that granting Hannah the doctor-recommended leave could "make [her] depression worse" and could even "be dangerous." J.A. 176, 422-23. After meeting with Hannah, the EAP counselor even suggested that Hannah could have bipolar disorder. J.A. 601-02. If faced with this evidence, a reasonable jury could easily find that the EAP sessions were in fact required medical examinations or disability-related inquiries.
With respect to the second prong of our inquiry-whether the EAP sessions were job-related and consistent with business necessity-questions of fact also preclude summary judgment. "[W]hether a mental examination was 'job-related and consistent with business necessity' is an objective inquiry." Pence v. Tenneco Auto. Operating Co., Inc ., 169 F. App'x 808, 812 (4th Cir. 2006) (citing Tice v. Centre Area Transp. Auth ., 247 F.3d 506, 518 (3d Cir. 2001) ). It is the employer who bears the burden of proving this prong. Kroll v. White Lake Ambulance Auth ., 763 F.3d 619, 623 (6th Cir. 2014). "A business necessity must be based on more than 'mere expediency,' and will be found to exist where the employer can 'identify legitimate, non-discriminatory reasons to doubt the employee's capacity to perform his or her duties.' " Coursey v. Univ. of Md. E. Shore , 577 F. App'x 167, 173 (4th Cir. 2014) (citing Conroy v. N.Y. State Dep't of Corr. Servs ., 333 F.3d 88, 97-98 (2d Cir. 2003) ; Thomas v. Corwin , 483 F.3d 516, 527 (8th Cir. 2007) ). A business necessity may also exist if a medical examination is necessary to determine "whether an employee's absence or request for an absence is due to legitimate medical reasons, when the employer has reason to suspect abuse of an attendance policy." Thomas , 483 F.3d at 527 (citing Conroy , 333 F.3d at 98 ).
I would find that ODNI is not entitled to summary judgment because a reasonable jury could conclude that the employer lacked a "reasonable belief based on objective evidence that [Hannah] was unable to perform the essential functions of her job or that she posed a threat to herself or to others based on a medical condition." Wright v. Ill. Dep't of Children and Family Servs. , 798 F.3d 513, 524 (7th Cir. 2015) ; see also Kroll , 763 F.3d at 623 ("[T]he individual who decides to require a medical examination must have a reasonable belief based on objective evidence that the employee's behavior threatens a vital function of the business." (citing Pence , 169 F. App'x at 812 ) (other citation omitted)). It is undisputed that Hannah's supervisors, as well as Mark Ewing, were involved in the decision to refer Hannah to the EAP. Therefore, the question is whether those supervisors had objective evidence that Hannah was unable to perform an essential function of her job. For the period including Hannah's "egregious" attendance issues, she received an overall performance rating of 4.53 out of 5.00-a rating of "Excellent." J.A. 406-10. Yet the majority concludes that her poor attendance precluded her from performing an essential function of her job.
I submit that this conclusion cannot be reached as a matter of law on this record, a record that seriously calls into question ODNI's sincerity in its assertion that Hannah was unable to perform an essential function of her job. For the entirety of Hannah's time as the disclosures coordinator on the Snowden project, she started work and left work later than other ODNI employees. J.A. 25, 494. Although she came in later, she got the job done, and she did it "impeccabl[y]." J.A. 412. She was able to manage her depression and worked long hours in a stressful environment while excelling. J.A. 19-20, 412. Her supervisors had no qualm with her attendance, and *359 aside from the maxi flex schedule, there was no formal work-hours requirement in place. J.A. 492-94, 518. When that project winded down in late 2014 and early 2015, Hannah's supervisors did not institute "core" hours or otherwise formally remove Hannah from the maxi flex schedule. J.A. 461, 518. In light of Hannah's ODNI-sanctioned history of beginning her work day later than others (a practice which simply continued into April 2015), the apparent lack of any formal policy requiring that her schedule be otherwise, and her consistent "excellent" performance reviews, there is at the very least a question of fact regarding ODNI's "reasonable belief based on objective evidence that [Hannah] was unable to perform the essential functions of her job." Wright , 798 F.3d at 524.
This is not to say that the essential functions of Hannah's job did not include regular attendance. See Tyndall v. Nat'l Educ. Ctrs., Inc. of Cal. , 31 F.3d 209, 213 (4th Cir. 1994). However, as discussed above, a jury could reasonably conclude that ODNI had no "reason to suspect abuse of an attendance policy," Thomas , 483 F.3d at 527 (citation omitted), when no such policy formally existed and when Hannah had been allowed for over a year to begin work later than other department employees. And although Hannah requested leave, her supervisors had decided before Hannah's request that they would defer a decision on any leave request until after the EAP referral because they expected a "quick answer" from EAP. J.A. 95. But "mere expediency" is insufficient to establish business necessity. Coursey , 577 F. App'x at 173.
In light of these considerations, I would submit the issue of whether the EAP sessions were job-related and consistent with business necessity to the jury for resolution.
D.
Finally, I would reverse the district court's grant of summary judgment on Hannah's FMLA retaliation claim. ODNI argues that Hannah cannot prove this claim because her non-selection for the Cyber position was due to "her significant attendance and reporting problems prior to her first leave request." Resp. Br. 48. For largely the same reasons that I would reverse with respect to Hannah's discrimination-in-hiring claim, I would find that there is sufficient evidence in the record to create a material issue of fact for the jury to decide on this claim.
Hannah suffered from a disability, one that could effectively be accommodated with leave. Unfortunately, her leave was granted only after she struggled to manage her disability-a struggle which a reasonable jury could readily conclude did not violate any attendance policy. Despite Hannah's rebound upon her return, ODNI used her late arrivals during the time for which she requested but was denied leave as grounds for denying her a permanent position, a position for which it is undisputed that she was exceptionally qualified. J.A. 623-25, 635-36. In essence, ODNI assigned Hannah to a high-stress position after which her depression worsened; delayed her request for FMLA-qualifying leave to accommodate her depression, thereby intensifying her symptoms; then refused to hire her for a permanent role when she returned from leave. Because of this, and for the reasons I articulate above, a jury could reasonably conclude that ODNI's rejection of Hannah's application for permanent employment was based on the exercise of her FMLA rights in requesting and taking a qualifying leave of absence to accommodate her disability.

Hannah was referred to the CIA's EAP program because ODNI did not have one of its own. The EAP provides employees with "free, confidential, short-term mental health[,] financial, and addictions counseling and referral to cleared community providers." J.A. 132.

ODNI does not dispute that Hannah's depression qualifies as a disability under the Rehabilitation Act.

Hannah's supervisors testified that, because she arrived later than other employees, they were forced to reassign work that would have fallen to her. There is evidence that the work assignments were made around 9:00 or 9:30 a.m. J.A. 108-09. Had Hannah's supervisors truly been concerned about being able to assign her work, one would expect the accommodation they offered to Hannah to have required her to come into the office by 9:00. No such requirement was ever made of her.

See J.A. 422 ("The recommendation of the group was if Hannah were to ask for leave, we should defer that decision until after meeting with EAP."); J.A. 176 ("EAP was concerned that since I was a single woman if I took leave I would be home by myself and that could make my depression worse.").

See J.A. 176 (Hannah's statement that she was told she had "no choice" but to attend the EAP sessions or her job would be terminated immediately).

See J.A. 584-85 (Mark Ewing's deposition testimony that EAP referral "wasn't initially just about" Hannah's temporary position but also because Ewing "knew she was looking for permanent employment").